IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x
In re:                                          :   Chapter 11
                                                :
A123 SYSTEMS, INC., et al.,                     :   Case No. 12-12859 (KJC)
                                                :
        Debtors.[1]                             :   Jointly Administered
---------------------------------------------------------------- x

## MOTION OF DEBTORS FOR ENTRY OF ORDER APPROVING (I) KEY EMPLOYEE INCENTIVE PLAN, (II) KEY EMPLOYEE RETENTION PLAN AND (III) POSTPETITION SEVERANCE PLAN

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**"), hereby move this Court (the "**Motion**") for entry of an order (the "**Order**"), in substantially the form attached hereto as Exhibit A, approving (i) a key employee incentive plan (the "**KEIP**"), (ii) a key employee retention plan (the "**KERP**") and (ii) a postpetition severance plan (the "**Severance Plan**"), each as more particularly described below, pursuant to the provisions of Sections 105(a), 363 and 503 of Title 11 of the United States Code (the "**Bankruptcy Code**"). In support of this Motion, the Debtors respectfully state:

### Jurisdiction

1.      This Court has jurisdiction over this Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, are: A123 Systems, Inc. (3876); A123 Securities Corporation (5388); and Grid Storage Holdings LLC (N/A). The above-captioned Debtors' mailing address is c/o A123 Systems, Inc., 200 West Street, Waltham, Massachusetts 02451.

2.     The statutory bases for the relief requested herein are Bankruptcy Code Sections 105(a), 363 and 503.

## Background

3.     On October 16, 2012 (the "**Petition Date**"), each of the Debtors filed a petition with the Court under Chapter 11 of the Bankruptcy Code (collectively, the "**Chapter 11 Cases**"). By order of the Court, the Chapter 11 Cases are being jointly administered for procedural purposes only.

4.     The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to Bankruptcy Code Sections 1107(a) and 1108. No request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases, and no committees have been appointed or designated.

5.     The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, are set forth in the *Declaration of David Prystash In Support of Chapter 11 Petitions and First Day Motions*, filed on the Petition Date and fully incorporated herein (the "**Prystash Declaration**").

6.     As set forth in the Prystash Declaration, the Debtors commenced the Chapter 11 Cases for the purpose of stabilizing their operations, obtaining access to new financing and maximizing the value of their assets through a sale, or multiple sales, of substantially all of the their assets pursuant to Bankruptcy Code Section 363. The Debtors have entered into an agreement to sell the assets, related contracts and intellectual property associated with their automotive business. The agreement is subject to an auction process, the approval of the Court and the satisfaction of certain conditions to closing. The Debtors are also engaged in an effort to

identify buyers for their remaining assets. The success of the Debtors' sale process, coupled with their ability in the interim to preserve and enhance their financial position through continuing operations and careful use of cash assets, will determine the level of recovery to be realized by their creditors.

### Relief Requested

7.   By this Motion, the Debtors request entry of an order, pursuant to Bankruptcy Code Sections 105(a), 363 and 503, approving and authorizing the implementation of (i) the KEIP, providing potential performance bonuses to certain of the Debtors' employees, including insiders and non-insiders, (ii) the KERP, providing retention bonuses to certain of the Debtors' employees, consisting of non-insiders only, and (iii) the Severance Plan, replacing the existing severance practice and providing severance benefits for all full-time employees, subject to certain conditions in the case of employees subject to separate severance agreements and to certain limitations in the case of employees who are insiders.

8.   In addition, the Debtors request that all amounts earned and payable under the KEIP, the KERP and the Severance Plan be afforded administrative expense priority under Bankruptcy Code Sections 503(a) and 507(a)(2) for all purposes in the Chapter 11 Cases and in any other cases under the Bankruptcy Code to which such cases may be converted.

### Description of the KEIP, the KERP and the Severance Plan

9.   <u>The KEIP</u>.  The KEIP is a performance-based incentive plan. Its participants will include approximately 9 employees, who are both insiders and non-insiders (the "**KEIP Participants**").[2]  It provides for potential performance bonuses if earned as a result of (a)

---

[2] To protect the privacy of the KEIP Participants and avoid any impact on employee morale, the identity of the KEIP Participants, along with their positions, salaries and target bonus percentages will be provided only to the Court, the Office of the United States Trustee, the Debtors' postpetition lender and the Official Committee of Unsecured Creditors.

3

successful sales of the Debtors' assets at a specified level and (b) preservation and enhancement of the Debtors' financial condition through the course of the sales process. The KEIP has an estimated cost ranging from $2.4 million to $4.2 million. The following is a description of the terms of the KEIP.

**KEIP Bonuses:**

Each KEIP Participant may earn two equally weighted bonuses:

    (a)    "**Asset Sale Bonus**" = Target Bonus x Asset Percentage (as defined below) x 50%

    (b)    "**DIP Budget Bonus**" =Target Bonus x DIP Budget Percentage (as defined below) x 50%

Each KEIP Participant's "Target Bonus" is equal to a percentage of his/her base salary (the "**Target Bonus**").

**Asset Sale Bonus:**

The "**Asset Percentage**" for calculating the Asset Sale Bonus will be determined based on the gross proceeds received by A123 upon sale of 85% or more of its assets (e.g., its automotive, electrical grid, commercial, governmental and associated manufacturing facilities) (the "**Asset Sale**") as follows:

| Gross Proceeds Received | Asset Percentage |
|---|---|
| Under $150,000,000 | 0% |
| $150,000,000 | 50% |
| $200,000,000 | 100% |
| $250,000,000 | 175% |

Performance between targets will be interpolated in a linear fashion, and for every $1,000,000 of gross proceeds received above $250,000.000 the Asset Percentage will be increased by 1%.

**DIP Budget Bonus:**

The "**DIP Budget Percentage**" is based on Cash Liquidity as a percentage of the DIP Budget Target as determined on the earlier of December 30, 2012 or the date the Asset Sale is completed (the "**Asset Sale Date**"), as shown in the table below:

| Cash Liquidity as a Percentage of DIP Budget Target | DIP Budget Percentage |
|---|---|
| Below 80% of DIP Budget Target | 0% |
| 80% of DIP Budget Target | 50% |

4

| | |
|---|---|
| 90% of DIP Budget Target | 80% |
| DIP Budget Target | 100% |
| DIP Budget Target + 30% | 125% |
| DIP Budget Target + 40% | 150% |
| DIP Budget Target + 50% | 175% |

Performance between levels will be interpolated in a linear fashion.

"**Cash Liquidity**" is the total liquidity on a book cash basis (cash in bank less outstanding checks) plus any unused availability under DIP credit agreement. The Debtors' "**DIP Budget Target**" is $12,000,994 (as described in the Debtors' DIP budget).

**Payments:**

KEIP Bonuses will be paid in cash lump sums (less required withholdings) on January 15, 2013 or, if later, the Asset Sale Date. If the KEIP Participant resigns, retires or otherwise voluntarily terminates his/her employment or is terminated by the Debtors for Cause prior to the Asset Sale Date, they will forfeit all bonuses. For the sake of clarity a KEIP Participant whose employment is terminated without Cause will be eligible to receive the KEIP bonuses, even if the KEIP Participant is hired by a buyer in the sale.

For this purpose "**Cause**" means:

   (a)   A material breach of the Participant's fiduciary duty to the Debtors or their stakeholders;

   (b)   failure to perform his or her reasonably assigned material duties for the Debtors;

   (c)   Gross negligence or willful misconduct resulting in a material detrimental effect on the Debtors;

   (d)   engaging in fraud, embezzlement or other material dishonesty;

   (e)   engaging in conduct which would constitute grounds for termination for violation of a material policy of the Debtors as in effect at the time;

   (f)   breach of any material provision of any nondisclosure, invention assignment, non-competition or other similar agreement; or

   (g)   Participant's conviction of, or entry of a plea of guilty or nolo contendere for, a felony or other crime involving moral turpitude.

Cause shall be determined by the Board of Directors (excluding the KEIP Participant, if the KEIP Participant is a member of the Board) and, only after the KEIP Participant's failure to cure, if amenable to cure, after receipt of written notice of the basis for Cause and a reasonable period to cure.

**Miscellaneous:**

All KEIP bonuses will be reduced by any other performance bonus, retention compensation, severance pay, including any pay in lieu of notice that may otherwise be payable to KEIP Participants.

10.  <u>The KERP</u>.  The KERP is a retention plan, intended to assist the Debtors in retaining the employees necessary to maintain business operations and fulfill their obligations as debtors in possession while they endeavor to maximize value through a successful sale process. Its participants will include approximately 66 employees, none of which are insiders (the "**KERP Participants**").[3] It provides a retention bonus of 25% of each participant's base salary ("**KERP Bonus**").  In addition, the KERP provides for a $300,000 discretionary pool to be used to provide retention benefits to other non-insider employees who do not otherwise participate in the KERP.  The KERP has an estimated cost of $2.7 million. The following is a description of the terms of the KERP.

**Payment:**

KERP Bonuses will be paid on January 15, 2013 or, if later, the Asset Sale Date (as defined in the KEIP). If a KERP Participant resigns, retires or otherwise voluntarily terminates his/her employment or is terminated by the Company for Cause prior to the Asset Sale Date, he/she will forfeit their KERP Bonus. For sake of clarity, a KERP Participant whose employment terminates prior to the Asset Sale Date as a result of another asset sale will be deemed to have been terminated by the Company without Cause (as defined in the KEIP) will be eligible to receive a KERP Bonus, even if the KERP Participant is hired by a buyer in the sale.

**Discretionary KERP Pool:**

A discretionary KERP pool not to exceed $300,000 in the aggregate or $30,000 individually without the consent of the Official Committee of Unsecured Creditors will be available for the CEO to award retention bonuses in his discretion to key employees who are neither insiders nor KERP Participants. Any such bonuses will be conditioned on the future performance of services for a to-be-determined length of time of not less than 30 days.

---

[3]    To protect the privacy of the KERP Participants and avoid any impact on employee morale, the identity of the KERP Participants, along with their positions and salaries will be provided only to the Court, the Office of the United States Trustee, the Debtors' postpetition lender and the Official Committee of Unsecured Creditors.

RLF1 7448212v.1

**Miscellaneous:**

All KERP Bonuses, including any bonuses from the discretionary KERP pool, will be reduced by any other retention compensation, or severance pay, including severance pay described below, and any pay in lieu of notice under the WARN Act or other similar state law that may otherwise be payable.

11.  The Severance Plan.  The Severance Plan is intended to be a new, postpetition plan that will replace the Debtors' prepetition severance plan and will be generally applicable to all full-time employees (currently approximately 937 individuals), including KEIP Participants and KERP Participants, with certain exceptions and subject to certain conditions and limitations described below.[4]  It will provide severance benefits in the event an employee is terminated without Cause (as defined above for the KEIP).  The maximum cost of the Severance Plan for US employees is estimated to be $6.8 million.  However, most employees are expected to be employed by the buyers as part of the Asset Sales, so the actual cost will be significantly lower.  The following is a description of the terms of the Severance Plan.

**Eligibility:**

Employees who

Employees who are offered employment with a buyer of assets will not be eligible for any severance.  KEIP Participants and KERP Participants who are not hired by any buyer

---

[4] The Debtors have a prepetition severance plan as described in the Motion of Debtors for Order Under 11 U.S.C. §§ 105(a), 363(b), 363(c), 507(a), 541, 1107(a) and 1108 and Fed. R. Bankr. P. 6003 (I) Authorizing Payment of Certain Prepetition Workforce Obligations, Including Compensation, Benefits, Expense Reimbursements and Related Obligations, (II) Confirming Right to Continue Workforce Programs on Postpetition Basis, (III) Authorizing Payment of Withholding and Payroll-Related Taxes, (IV) Authorizing Payment of Prepetition Claims Owing to Administrators of, or Third Party Providers Under, Workforce Programs and (V) Directing Banks to Honor Prepetition Checks and Fund Transfers for Authorized Payments [Docket No. 9; filed October 6, 2012] (the "**First Day Employee Motion**").  The First Day Employee Motion requests authorization to continue that severance practice and to allow employees with separate severance agreements to participate if they voluntarily terminate their agreements and waive claims thereunder, and limits severance for insiders to the maximum amount authorized under the Bankruptcy Code (the "**Previously Pending Proposal**").  The Severance Plan proposed herein is a new postpetition severance plan that, if approved, would completely replace the Previously Pending Proposal.  The end result of the Previously Pending Proposal and the Severance Plan would be identical as to terms and participation. The difference is that the Previously Pending Proposal is based on a prepetition plan and the Severance Plan is a postpetition plan.

RLF1 7448212v.1

will be eligible for the greater of the severance or the applicable KEIP Bonus or KERP Bonus, but not both.

Any employee who currently has a separate written agreement providing severance benefits (an "**Individual Agreement**") will be required to terminate his/her Individual Agreement and waive all claims thereunder to be eligible for severance under the Severance Plan. If they decline to do so, they may retain their rights under their Individual Agreements, which will be treated in accordance with the provisions of the Bankruptcy Code and may be subject to rejection by the Debtors.

**Severance Benefit:**

Eligible employees will receive a minimum of 2 weeks of Pay plus one additional week of Pay for each full year of service with the Debtors. The maximum severance will equal 12 weeks of Pay. Payments to insiders will be limited in accordance with the provisions of Bankruptcy Code Section 503(c)(2)(B). "**Pay**" means for a salaried employee his/her weekly base salary and for an hourly employee his/her hourly rate of pay x 40.

**Payment:**

Receipt of severance pay will be conditioned upon execution of a general release of claims within 50 days of termination.[5] Severance will be paid in a cash lump sum on the first regularly scheduled payroll following the effective date of the release.

**Offsets:**

Severance will be offset by any pay in lieu of notice under the WARN Act or other similar state law.

### Basis for Relief

12.  The filing for chapter 11 relief creates a challenging environment for a debtor's workforce with consequences that jeopardize the ability of a debtor to maintain operations and maximum value for the debtor's stakeholders. Historically, bankruptcy courts and parties in interest recognized the importance of ameliorating workforce stress and promoting employee morale and loyalty through carefully crafted incentive, retention and severance plans. Such plans were routinely approved under Bankruptcy Code Section 363(b) as a valid exercise of the debtor's business judgment. Although the types of plans and the employees eligible to

---

[5] This time period reflects the 45 days required by law for an employee to consider a release under the Age Discrimination in Employment Act (ADEA) in a group termination context, plus 5 days for the Debtors to provide the release.

8

participate in the plans have changed since the enactment of Bankruptcy Code Section 503(c) pursuant to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, there remains a recognized need to provide certain enhanced benefits and protections to employees working under the strains of the bankruptcy process.

13. The Debtors propose the KEIP, the KERP and the Severance Plan in the context of a chapter 11 process that is intended to result in the sale of their various businesses over a several month period during which their operations must be maintained, their financial condition must be preserved and their new debtor-in-possession duties must be performed. None of this can be achieved without the continuing support of their key employees. However, the circumstances are such that all of the employees face an uncertain future in which their employment by the Debtors will terminate when the sale process is completed and no guarantees of employment by any buyer can be offered. The key employees are highly skilled and marketable in their respective areas of expertise and are likely to be able to readily find new employment. Yet, it is critically important to the success of the sale process that the employees remain with the Debtors and be incentivized to produce value. In fact, the agreement for the pending sale of the Debtors' automotive business requires as a condition to closing that 80% of certain specified employees (to be identified by the buyer) remain and agree to accept employment with the buyer. This all necessitates that the Debtors be afforded the opportunity to offer incentives and protections that will encourage their employees to delay a move to a new employer.

14. The KEIP, the KERP and the Severance Plan have been designed to achieve the objective of continuing employment within the parameters of Bankruptcy Code Section 503(c), which provides as follows:

(c) Notwithstanding subsection (b), there shall neither be allowed, nor paid—

(1) a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business, absent a finding by the court based on evidence in the record that—
(A) the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;
(B) the services provided by the person are essential to the survival of the business; and
(C) either—
(i) the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or
(ii) if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred;

(2) a severance payment to an insider of the debtor, unless—
(A) the payment is part of a program that is generally applicable to all full-time employees; and
(B) the amount of the payment is not greater than 10 times the amount of the mean severance pay given to nonmanagement employees during the calendar year in which the payment is made; or

(3) other transfers or obligations that are outside the ordinary course of business and not justified by the facts and circumstances of the case, including transfers made to, or obligations incurred for the benefit of, officers, managers, or consultants hired after the date of the filing of the petition.

11 U.S.C. § 503(c).

15. As set forth above, the restrictions in Bankruptcy Code Section 503 primarily apply to "insiders" in the context of retention and severance plans. As defined in Bankruptcy Code Section 101(31)(B), with respect to corporate debtors like the Debtors herein, insiders include any director of the debtor, officer of the debtor, person in control of the debtor,

partnership in which the debtor is a general partner, general partner of the debtor or relative of a general partner, director, officer, or person in control of the debtor. See 11 U.S.C. § 101(31)(B).

16. The KERP, which is a retention bonus program subject to Bankruptcy Code Section 503(c)(1), does not run afoul of that section because the KERP Participants do not include any insiders. Although certain of the KERP Participants have operational titles that contain words that are also common to insider positions (like VPs and Directors), they are not in fact insiders.[6]

17. The Severance Plan also passes muster under Bankruptcy Code Section 503(c)(2). First, as required, it is a plan that is generally applicable to all full-time employees of the Debtors. Second, it specifically limits payments to insiders to amounts payable under the section, which means no insider will receive more than 10 times the amount of the mean severance pay given to nonmanagement employees during the calendar year in which the insider payment is made.

18. The KEIP is a true incentive plan with challenging performance targets that will not be easily met, but if met will optimize recoveries for the Debtors' creditors. As such, it is not a disguised retention plan that must exclude insiders under Bankruptcy Code Section 503(c)(1). Moreover, the KEIP, as properly structured to permit insiders to be included as KEIP Participants, and considering the objectives of the Debtors and the importance of the KEIP Participants to fulfilling those objectives, is amply justified by the facts and circumstances of the Chapter 11 Cases and, thus, not prohibited under Bankruptcy Code Section 503(c)(3).

19. In as much as the KEIP, the KERP and the Severance Plan are not prohibited by Bankruptcy Code Section 503(c), the Court may authorize the Debtors to implement such plans

---

[6] The Debtors are prepared to rebut any presumption of insider status that may apply to certain operational titles. In the event that the presumption is not successfully rebutted, the Debtors reserve the right to move any KERP Participant who is found to be insider out of the KERP and into the KEIP.

under Bankruptcy Code Section 363(b)(1), which permits a debtor in possession to use property of the estate "other than in the ordinary course of business" after notice and a hearing. 11 U.S.C. § 363(b)(1).

20.     The use, sale, or lease of property of the estate, other than in the ordinary course of business, is authorized when a "sound business purpose" justifies such action. See, e.g., Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (noting that under normal circumstances, courts defer to a trustee's judgment concerning use of property under Bankruptcy Code Section 363(b) when there us a legitimate business justification); In re Delaware & Hudson R.R. Co., 124 B.R. 169, 176 (D Del. 1991) (explaining that the Third Circuit has adopted the "sound business purpose" test to evaluate motions brought pursuant to Bankruptcy Code Section 363(b)).

21.     The Debtors submit that implementation of the KEIP, the KERP and the Severance Plan is a proper exercise of their business judgment. The incentives and protections offered by such plans are key to the Debtors' ability to close the pending sale of their automotive business and to market their remaining assets for maximum value, which must be done while continuing business as usual, operating in a financially prudent manner and fulfilling their obligations under the Bankruptcy Code. Without the ability to offer such incentives and protections, the Debtors risk losing their key employees and with them considerable value that could be used to pay the claims of creditors. The cost of the KEIP, the KERP and the Severance Plan is more than reasonable in view of the losses the Debtors would suffer if they could complete the sale process in a responsible manner.

22.     In view of the foregoing, the Debtors submit that approval of the KEIP, the KERP and the Severance Plan is in the best interest of the Debtors' estates and all parties in interest.

## Notice

23.     Notice of this Motion will be given to: (a) the United States Trustee for the District of Delaware, (b) counsel to the Debtors' postpetition secured lender, (c) counsel to the Debtors' prepetition secured lender, (d) counsel to the Indenture Trustee under the Debtors' prepetition 2012 Senior Convertible Notes (as defined in the Prystash Declaration), (e) counsel to the Indenture Trustee under the Debtors' prepetition 2011 3.75% Convertible Subordinated Notes (as defined in the Prystash Declaration), (f) the Securities and Exchange Commission, (g) counsel to Johnson Controls, Inc., as Stalking Horse Bidder, (h) the U.S. Department of Energy, (i) the U.S. Department of Justice, (j) the Michigan Economic Growth Authority, (k) the vendors expected to assert 503(b)(9) Claims, (l) the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors and (m) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.  The Debtors submit that, under the circumstances, no other or further notice is required.

**WHEREFORE,** the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as <u>Exhibit A</u>, granting the relief requested in the Motion and such other and further relief as may be just and proper.

Dated: Wilmington, Delaware
       October 19, 2012

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Amanda R. Steele*
Mark D. Collins (No. 2981)
Michael J. Merchant (No. 3854)
Drew G. Sloan (No. 5069)
Amanda R. Steele (No. 5530)
920 N. King Street
Wilmington, Delaware 19801
Telephone: 302-651-7700
Facsimile: 302-651-7701
Email: collins@rlf.com
      merchant@rlf.com
      dsloan@rlf.com
      steele@rlf.com

- and -

D. J. Baker
Caroline A. Reckler
Adam S. Ravin
Matthew L. Warren
LATHAM & WATKINS LLP
885 Third Avenue
New York, New York 10022-4834
Telephone: 212-906-1200
Fax: 212-751-4864
Email: dj.baker@lw.com
      caroline.reckler@lw.com
      adam.ravin@lw.com
      matthew.warren@lw.com

Proposed Counsel for Debtors and Debtors in Possession