UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | CHAPTER 11 |
| | : | |
| **B456 SYSTEMS, INC., et al.**[1] | : | Case No. 12-12859 (KJC) |
| | : | (Re: D.I. 2211, 2239) |
| Debtors | : | |
| | : | |

# **MEMORANDUM**[2]

## BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

Before the Court is a motion for partial summary judgment (D.I. # 2211) (the "Summary Judgment Motion") filed by Daimler Purchasing Coordination Corp. ("DPCC") and a cross-motion for partial summary judgment (D.I. # 2239) (the "Cross-Motion") filed by Pirinate Consulting Group, LLC as the trustee (the "Trustee") of the B456 Liquidation Trust (the "Liquidation Trust"). DPCC filed a proof of claim for $25.5 million (the "Claim") for damages resulting from the Debtors' rejection of an alleged contract between debtor A123 Systems, Inc. ("A123") and Daimler AG ("Daimler"), pursuant to which A123 would manufacture and supply Daimler with lithium-ion starter batteries (the "Starter Batteries") to replace lead acid batteries in certain Mercedes-Benz car lines.[3] The Trustee argues that a contract was never formed because, among other things, A123 did not accept DPCC's offers nor did A123 execute a writing sufficient to satisfy the statute of frauds. For the reasons set forth below, the Court will grant DPCC's Summary Judgment Motion, in part, and deny the Trustee's Cross-Motion.

---

[1] The Debtors are as follows: B456 Systems, Inc. (f/k/a A123 Systems, Inc.), B456 Securities Corporation (f/k/a A123 Securities Corporation), and Grid Storage Holdings LLC (the "Debtors").

[2] This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding pursuant to 28 U.S.C. §157(b)(1) and (b)(2)(B).

[3] All other proofs of claim filed by DPCC have been resolved by stipulation.

## PROCEDURAL BACKGROUND

On October 16, 2012 (the "Petition Date"), A123 and affiliated entities (the "Debtors")

filed voluntary chapter 11 bankruptcy petitions.  On December 11, 2012, the Court entered an

order approving the sale of substantially all of the Debtors' assets to Wanxiang America

Corporation ("Wanxiang")  (D.I. # 640) (the "Sale Order").[4]

On January 25, 2013, the Debtors filed the Motion for Entry of an Order Authorizing the

Rejection of Certain Unexpired Leases and Executory Contracts (D.I. # 895) (the "Rejection

Motion") in which the Debtors sought authority to reject all contracts which they determined

were not necessary to the Debtors' estates. On February 13, 2013, the Court entered the Order

Authorizing the Debtors' Rejection of Certain Unexpired Leases and Executory Contracts

(D.I. # 1029) (the "Rejection Order").  The Rejection Order had three exhibits: (i) Exhibit A:

Contracts and Leases Assumed and Assigned to Purchasers; (ii) Exhibit B: Retained Contracts

and Leases; and (iii) Exhibit C: Rejected Contracts and Leases.  The Rejection Order provided

that "[a]ll executory contracts to which the Debtors are a party and which are not listed on

Exhibit A or B hereto (the "Rejected Contracts") are hereby rejected, effective as of the date of

this Order."[5]

---

[4] In accordance with the terms of sale to Wanxiang, the Debtors subsequently changed their corporate names.

[5] In the Rejection Motion, the Debtors stated that "[t]he Debtors and their professionals have used their best efforts to identify and list on Exhibit C to the Proposed Order all Rejected Contracts. However, to the extent the Debtors have inadvertently failed to include a Rejected Contract on Exhibit C, the Debtors request that any order granting this Motion be deemed to apply to such Rejected Contract." (D.I. # 895, ¶8 (footnote omitted).)  There are three DPCC contracts listed on Exhibit C, one of which is identified as Contract No. 6900061, or the Second Purchase Contract, as defined herein.

On March 11, 2013, DPCC filed the Claim.[6]  On March 29, 2013, the Official Committee

of Unsecured Creditors (the "Committee") filed an objection to the Claim (D.I. # 1318) (the

"Claim Objection") asserting, among other things, that DPCC failed to provide supporting

documentation sufficient to identify a supply agreement or purchase contract.

### *FACTS*

A123 manufactured and supplied batteries for electric and hybrid-electric vehicles for the

automotive industry.  Daimler is a German original equipment manufacturer ("OEM") and

DPCC is a United States purchasing affiliate of Daimler.  In July 2010, Daimler issued a request

for quotation ("RFQ") to various suppliers, including A123, for Starter Batteries to be

incorporated into certain Mercedes-Benz automobiles.  (A83-A91.)[7]  The RFQ requested

proposals based on Daimler's purchase of either 25,000 units per year or 50,000 units per year.

The RFQ asked for a "price firmly agreed for a period of 3 years after the end of series

production."  (A86.)  Among other things, the RFQ also attached terms and conditions and

provided that "Daimler considers the offers handed over or sent in by the supplier to be an

acknowledgment of the currently valid 'Terms and Conditions for the Purchase of Production

Material and Parts for Vehicles,' 'Mercedes-Benz Special Terms,' as well as the requirements in

and attachments to this inquiry." (A90-A91.)

---

[6] The Claim was assigned claim no. 770.

[7] Citations are made to the pages in the appendices attached to the parties' briefs.  The appendix
to DPCC's brief in support of the Summary Judgment Motion (D.I. 2213) is marked as pages A1 - A545;
the appendix to the Trustee's brief in opposition to the Summary Judgment Motion (D.I. 2238) is marked
as pages B1 - B696; the appendix to DPCC's response in opposition to the Trustee's Cross-Motion (D.I.
2262) is marked as pages C1 - C240; and the appendix to the Trustee's reply brief in support of the
Cross-Motion (D.I. 2267) is marked as pages B697 - B873.

On September 1, 2010, A123 responded to the RFQ and quoted prices for two types of

batteries[8] based on the two quantity scenarios for the five-year period of 2013 through 2017

(A154-A171), following which the parties began extensive negotiations regarding contract terms

and technical specifications.  Terms being negotiated included Daimler's payment of $1.85

million to offset development expenses (also referred to as non-recurring engineering costs

("NRE")), length of the warranty, unit pricing, and prototype costs.  (A325-A327.)  In December

2010, Daimler nominated A123 as the supplier of the Mercedes-Benz Starter Batteries.  (A274-

A275.)  Following the nomination, A123 and Daimler engineers held a "kickoff" meeting to

begin work and development on the Starter Batteries.  (A274, B24:19 - B25:7.)  Also, after the

nomination, the parties would begin "final contract discussion[s] . . ." (A274.)

In May 2011, DPCC provided the first proposed purchase contract (the "First Purchase

Contract") to A123.  (B312 - B319.)  The First Purchase Contract provided at the bottom of each

page that the supplier must return an agreed-to and signed copy to Daimler.  The First Purchase

Contract also provided that the "Annual Purchase Contract is valid from 05/01/2011 to

12/31/2011," although DPCC claimed that its employee who created the form mistakenly

selected the annual contract term, rather than a multi-year term. (A295; B275:8 - 22.)  On

May 20, 2011, Juergen Gerl (A123's sales representative in Germany) sent an email to Sarah

Daehnert (a Daimler purchasing employee) informing her that the First Purchase Contract did not

reflect the parties' negotiations.  (B320 - B347.)  An attachment to the email lists A123's specific

issues with the First Purchase Contract, including the warranty, "first to market" provision, and

---

[8] The response provided different prices for Starter Batteries with different ampere hours of electric charge, i.e., 60Ah battery and 80Ah battery.  (A160.)

4

development costs.  A123 also suggested changes to the general terms and conditions.  On June 9, 2011, Mr. Gerl sent another email to Ms. Daehnert stating "[a]s exchanged previously and discussed over the phone on Tuesday we need to urgently focus on the discussion about the received "purchase contract" from Daimler US.  We see major discrepancies in understanding which prevents us to sign and agree to it."  (B291.)

Nonetheless, by the summer of 2011, A123 supplied prototype starter batteries to Daimler amid discussions about whether they were part of production pricing or spot buys.  (A493-A495; B452-B455; B495.)  The parties continued the development, testing and validation process in an effort to meet Daimler's target production date of 2013.  Each party covered its own costs at this time.  Daimler spent approximately €1 million developing a test laboratory specifically for the Starter Batteries.  (A147:18-A149:23.)  However, Daimler needed the laboratory to test Starter Batteries regardless of the supplier chosen.  (B73:15-B74:7.)  A123 built manufacturing lines and prepared its facilities to produce Starter Batteries that, A123 said, could be sold to other customers in addition to Daimler.  (B305-B310.)

At A123's request, representatives from Daimler and A123 met at A123's facilities in Livonia, Michigan from September 6-9, 2011 to discuss outstanding issues with respect to the First Purchase Contract (the "Livonia Meetings").  The parties agreed to revised terms, which were circulated in post-meeting emails.  (A497-A500; A502-A506; B379-B380; B382-B391.)  A123 announced to the investing public that it had secured a production contract with a "major German OEM," meaning Daimler.  (A192:25-A193:25.)

On or about November 15, 2011, DPCC sent a second version of the Purchase Contract (the "Second Purchase Contract") to A123.[9] (B408-B439.) The Second Purchase Contract provided that it was an "Annual Purchase Contract . . . valid from 1/1/2012 to 12/31/2012." (B408.) A123 did not sign the Second Purchase Contract, claiming that it did not contain the contract terms agreed to at the September Livonia Meetings. By email dated June 26, 2012, A123's Director of Sales confirmed a meeting to discuss terms, including "updated pricing" and "NRE Discussion." (B441-B442.) Around this same time, A123 was telling potential strategic investors or partners that A123 and Daimler had entered into a contract for Starter Batteries and that production would begin in 2013. (A216:18-A220:5.)

On October 16, 2012, the Debtors filed their chapter 11 bankruptcy petitions. After the bankruptcy filing, A123 needed funds to continue testing the Starter Batteries as part of the development process. The parties met and Daimler agreed to pay A123 a portion of the total NRE costs ($280,000) up front. (A73:2-A81:20.) In early December 2012, A123 and DPCC signed a letter agreement described as an "Amendment to Purchase Contracts" (the "Amendment") that memorialized DPCC's agreement to pay $280,000 for "Critical Test Costs" and further provided that: "[t]he base price for each Battery is reduced to $487.43 (USD). All agreed price adjustments continue to apply ." (B573-B575.) The Amendment also provided that: "The Contracts continue in full force and effect except as expressly amended by this Amendment." (B574.) In an email exchange prior to making the $280,000 payment, A123's counsel confirmed to Daimler that the Daimler contracts listed in the Amendment were on

---

[9] At times, the First Purchase Contract and the Second Purchase Contract are referred to jointly herein as the "Purchase Contracts."

6

A123's "internal list of contracts that will be considered for possible assumption." (A652.) A

presentation sent to Wanxiang prior to closing on the Court-approved sale of A123's assets

included the Daimler Starter Battery program in the list of Top Programs for 2014 Revenue.

(A678; *see* A669-A695, generally.)[10]

### STANDARD FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure, made applicable by Federal Rule of

Bankruptcy Procedure 7056, provides that "[t]he court shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(a).  At the summary judgment stage, the

court's function is not to weigh the evidence and determine the truth of the matter, but to

determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 249 (1986).

The moving party bears the burden of establishing the absence of a genuine dispute as to

a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  ("[A] party seeking

summary judgment always bears the initial responsibility of informing the district court of the

basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any,' which it believes

---

[10] Both execution of the Amendment and payment of the $280,000 occurred *after* commencement of the chapter 11 cases.  A search of the docket by the Court does not reveal any request for court approval of these post-petition events. *Compare* Bankruptcy Code §363(c) (court approval is not required for an ordinary course of business transaction) and Bankruptcy Code §363(b)(1) (court approval is required for transactions *not* in the ordinary course of business).  Neither party identified this as an issue.  I note that the Amendment was signed by A123 on December 10, 2012, and the Sale Order approving the sale to Wanxiang is dated December 11, 2012.  I suspect that the parties were anxious to "wrap up" their contractual arrangement to position themselves for possible assumption of their agreement by the successful purchaser of the Debtors' business.

demonstrate the absence of a genuine issue of material fact."). When the nonmoving party bears the burden of persuasion at trial, the moving party "may meet its burden . . . by showing that the nonmoving party's evidence is insufficient to carry that burden." *Foulk v. Donjon Marine Co., Inc.,* 144 F.3d 252, 258 n.5 (3d Cir. 1998) (quoting *Wetzel v. Tucker,* 139 F.3d 380, 383 n.2 (3d Cir. 1998)).

Once the moving party has carried its initial burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). Summary judgment cannot be avoided by introducing only "a mere scintilla of evidence," *Sarko v. Penn-Del Directory Co.,* 968 F.Supp. 1026, 1031 (E.D. Pa. 1997) (citation omitted), *aff'd* 189 F.3d 464 (3d Cir. 1999), or by relying on "conclusory allegations, improbable inferences and unsupported speculation." *J.Geils Band Emp. Benefit Plan v. Smith Barney Shearson, Inc.,* 76 F.3d 1245, 1251 (1st Cir. 1996). "Brash conjecture coupled with earnest hope that something concrete will materialize, is insufficient to block summary judgment." *Id.* (quoting *Dow v. United Bhd. of Carpenters,* 1 F.3d 56, 58 (1st Cir. 1993)).

Consideration of competing motions for summary judgment does not change this standard. As stated by the Third Circuit "'[c]ross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'" *Lawrence v. City of Philadelphia,* 527 F.3d 299, 310 (3d Cir. 2008) (quoting *Rains v. Cascade Indus., Inc.,* 402 F.2d 241, 245 (3d Cir. 1968)).

8

Substantive law determines which facts are material; only disputes over facts that might affect the outcome of the suit will preclude summary judgment. *Anderson,* 477 U.S. at 248. Moreover, a dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id. See also Delta Mills, Inc. v. GMAC Comm. Fin., LLC (In re Delta Mills, Inc.),* 404 B.R. 95, 105 (Bankr. D. Del. 2009) (An issue is genuine "when reasonable minds could disagree on the result."). The Court must resolve all doubts and consider the evidence in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255 ("[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

## *DISCUSSION*

The Trustee and DPCC asked, and the Court agreed, to bifurcate determination of the issues raised by the Trustee's objection to the Claim: first, whether there is a binding and enforceable contract between A123 and DPCC and, if so, whether the contract is a requirements-based contract with a six-year term (the "Contract Issues"), and then, second, fixing the amount of the Claim. The Summary Judgment Motion and Cross-Motion address only the Contract Issues.

DPCC argues that it is entitled to summary judgment because there is no genuine dispute as to a material fact that (i) A123 accepted the Purchase Contracts and all of its terms by commencing work on the Starter Batteries, which, it argues, were specially manufactured for Daimler, (ii) any open issues with respect to the Purchase Contracts' terms have no bearing on the existence of the Purchase Contracts or the validity of the Claim, and (iii) the Purchase Contracts constituted a long-term requirements contract for supply of the Starter Batteries

through at least 2017 based on the Michigan Uniform Commercial Code, course of performance, course of dealing, and trade usage in the automotive industry.

The Trustee argues that he is entitled to summary judgment because there is no genuine dispute as to a material fact that A123 repeatedly and unambiguously rejected the Purchase Contracts. In support, the Trustee argues that A123 (i) never signed or returned the Purchase Contracts to DPCC, (ii) did not waive its right to signed acceptance of the Purchase Contracts, (iii) did not commence work on or deliver any specially manufactured Starter Batteries for DPCC or Daimler, and (iv) the Michigan statute of frauds bars enforcement of the unsigned Purchase Contracts.

    (1)    <u>The signed Amendment between A123 and DPCC establishes that there was a written, enforceable contract between the parties</u>

The Trustee argues that DPCC's claim is barred by Michigan's statute of frauds, which provides, in pertinent part, that "a contract for the sale of goods for the price of $1,000 or more is not enforceable by way of action or defense unless there is a writing signed by the party against whom enforcement is sought . . . ." Mich. Comp. Laws Ann. § 440.2201(1). The Trustee argues that there is no binding, enforceable contract because A123 did not sign, date, and return the Purchase Contracts to DPCC. DPCC argues that it does not strictly enforce the signature requirement, and that few suppliers return a signed copy of the purchase contracts. (B276:5-B277:13.)

The parties do not dispute that the Purchase Contracts were offers by DPCC to purchase the Starter Batteries. "An offer is defined as the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to the bargain is

invited and will conclude it." *Kloian v. Domino's Pizza, LLC*, 273 Mich. App. 449, 453, 733

N.W.2d 766 (Mich. Ct. App. 2006) quoting *Eerdmans v. Maki*, 226 Mich. App. 360, 364, 573

N.W.2d 329 (Mich. Ct. App. 1997).[11]

The parties dispute, however, whether A123 accepted the terms of DPCC's offer and

created a binding contract. The Trustee points to several communications in which A123

expressly objects to specific terms in the Purchase Contracts, including the NRE, the first-to-

market and warranty provisions, and other items. (B291, B441, B444, B446-47.) In response,

DPCC argues that, after the Livonia Meetings, representatives of A123 exchanged internal

communications indicating that the spreadsheet prepared at the meeting was an accurate

representation of the agreement reached by the parties. (A502; A497-A500.) However, after

DPCC sent the Second Purchase Contract to A123, A123 continued to argue that the terms of the

Second Purchase Contract did not reflect the parties' agreement. (B441-B442.) These facts show

that DPCC provided A123 with offers, and that A123 responded with counter-proposals and

requests for continued negotiations to arrive at a memorialization of agreeable terms.

> [A]ny material departure from the terms of an offer invalidates the offer as made and
> results in a counter proposition, which, unless accepted, cannot be enforced. The
> acceptance must be absolute and unconditional, and if conditions are attached or if
> it differs from the offer, the transaction amounts only to a proposal and a counter
> proposal.

*Turning Leaf Homes, Inc. v. Grady*, No. 255322, 2006 WL 1113237, *3 (Mich. Ct. App. Apr. 27,

2006) (unpublished) quoting *Harper Bldg. Co. v. Kaplan*, 332 Mich. 651, 655, 52 N.W.2d 536

---

[11] The Purchase Contracts (A293) provide, and the parties do not dispute, that Michigan law is
applicable. Under Delaware law, express choice of law provisions in contracts are generally given effect.
*Weiss v. Northwest Broadcasting, Inc.*, 140 F. Supp. 2d 336, 342 (D. Del. 2001). Further, a choice of
law analysis using Delaware's "most significant relationship" test of the RESTATEMENT (SECOND) OF
CONFLICTS § 188 would yield the same result.

(1952).

However, in December 2012, DPCC and A123 reached a critical juncture in their

relationship. A123 needed funds to complete testing the Starter Batteries and Daimler agreed to

pay a portion of A123's NRE costs up front to ensure that the testing would proceed. The parties

then executed the Amendment to the Purchase Contracts to memorialize their agreement, which

provided, in pertinent part, as follows:

> **Daimler Purchasing Coordination Corp. ("DPCC"), and A123 Systems, Inc. ("Supplier") are parties to Purchase Contracts dated November 29, 2012 (No. 1285703299), November 15, 2011 (No. 6900067), and May 5, 2011 (No. 6900061) (collectively, the "Contracts"). The Contracts govern Supplier's design and manufacture, and the purchase by DPCC, of certain Lithium Ion 12V starter batteries (the "Batteries").**
>
> DPCC and Supplier have agreed to amend the Contracts as follows:
>
> • DPCC will pay up to $280,000 for third party testing required under the Contracts that DPCC, in its sole discretion, deems critical to meet applicable production schedules (the "Critical Test Costs"). DPCC will pay the Critical Test Costs by remitting funds to Supplier upon Supplier's presentation to DPCC of an invoice for Critical Test Costs in form satisfactory to DPCC.
>
> • Supplier agrees: (a) that Supplier will hold all amounts received from DPCC in trust for the benefit of DPCC and third party vendors who have submitted invoices for Critical Test Costs approved by DPCC (each a "CTC Vendor"); (b) to remit all amount so received from DPCC to CTC Vendors immediately upon receipt from DPCC; and (c) to promptly confirm such remittance by delivering confirmation of payment to CTC Vendors in form satisfactory to DPCC.
>
> • The base price for each Battery is reduced to $487.43 (USD). All agreed price adjustments continue to apply.
>
> Any claim that DPCC has against Supplier for breach of contract or setoff is expressly reserved and neither the execution of this Amendment nor DPCC's agreement to pay Critical Test Costs shall constitute a release or waiver of any such claim, or any administrative or other priority granted under the bankruptcy code with respect to any such claim.

. . . .

**The Contracts continue in full force and effect except to the extent
expressly amended by this Amendment.** This Amendment: (a) shall, in the event
of assumption of the Contracts, be binding on Supplier's successors and assigns,
including any assignee to whom the Contract is assigned pursuant to 11 U.S.C. §365;
(b) may be executed in any number of counterparts, each of which shall be deemed
to be an original; and (c) may be executed by signatures delivered by facsimile or
other electronic means and that facsimile and electronic signatures shall be treated
as originals for all purposes.

Nothing in this Amendment shall constitute or effect an assumption by
Supplier of the Contracts under 11 U.S.C. §365, as an assumption can occur only by
order of the Bankruptcy Court for the District of Delaware. DPCC hereby waives
any argument that this Amendment constitutes an assumption of the Contracts or
creates any increased obligation upon the Supplier to elect to assume the Contracts.

If the Supplier rejects the Contracts, DPCC may be entitled to a claim for
rejection damages pursuant to 11 U.S.C. §365. Further, if the Contracts are rejected,
any rejection damages claim will be determined based upon the terms of the
Contracts as modified by this Amendment, provided, however, that DPCC agrees that
neither Supplier's execution of this Amendment or performance of the Contracts
pursuant to this Amendment in any way (a) alters the Supplier's right to reject the
Contracts, or (b) changes the amount or priority of any rejection damage claim DPCC
would have in the absence of Supplier's execution of this Amendment or
performance of the Contracts.

(B573-B574) (emphasis added). The Amendment is signed by representatives of both DPCC and

A123. An email chain between representatives of A123 and A123's bankruptcy counsel, dated

between December 7, 2012 and December 12, 2012, attached copies of the Purchase Contracts

which they agree "accurately reflect[] the latest Daimler Purchase Contracts." (B625.)

Despite the signed Amendment containing the required terms, the Trustee argues that

issues of material fact prevent summary judgment in favor of DPCC because the Purchase

Contracts were never signed individually and there are numerous communications from A123 to

DPCC objecting to terms in the Purchase Contracts. However, A123's objections were raised

13

prior to negotiating and signing the Amendment, in which A123 agreed to be bound by the Purchase Contracts in return for the $280,000 payment.[12]

The signed Amendment contains a clear, unequivocal statement by A123 that it is a party to a binding and enforceable contract with DPCC for the sale of Starter Batteries pursuant to the terms set forth in the Purchase Contracts. "[A]n acceptance sufficient to create a contract arises where the individual to whom an offer is extended manifests an intent to be bound by the offer, and all legal consequences flowing from the offer, through voluntarily undertaking some unequivocal act sufficient for that purpose." *Id.* at 453-54 quoting *Blackburne & Brown Mortgage Co. v. Ziomek,* 264 Mich. App. 615, 626-27, 692 N.W.2d 388 (Mich. Ct. App. 2004).

Moreover, the signed Amendment satisfies the statute of frauds. Comments to the statute provide that a writing may satisfy the statute of frauds, even if it does not contain all of the material terms:

> The required writing need not contain all the material terms of the contract and such material terms as are stated need not be precisely stated. All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction. It may be written in lead pencil on a scratch pad. It need not indicate which party is the buyer and which the seller. The only term which must appear is the quantity term which need not be accurately stated but recovery is limited to the amount stated. The price, time and place of payment or delivery, the general quality of the goods, or any particular warranties may all be omitted.
> . . . .
>
> Only three definite and invariable requirements as to the memorandum are made by this subsection. First, it must evidence a contract for the sale of goods; second, it must be "signed," a word which includes any authentication which identifies the party to be charged; and third, it must specify a quantity.

---

[12] Because I conclude that the Amendment constitutes A123's agreement that it is a party to the Purchase Contracts, I need not decide (i)whether A123's conduct during the time between its response to the RFQ and entry into the Amendment constitutes acceptance of a contract with DPCC, or (ii) whether the Starter Batteries were specially manufactured goods for Daimler.

Mich. Comp. Laws Ann. 440.2201, cmt. 1. Here, there exists a formal document, signed by

sophisticated business entities, acknowledging the full force and validity of the Purchase

Contracts. The Amendment easily meets the first two requirements necessary to satisfy the

statute of frauds: (i) the Amendment evidences the existence of the contract for A123's sale of

Starter Batteries to DPCC as set forth in the Purchase Contracts; and (ii) the Amendment is

signed by A123.

The third requirement - - quantity - - is not readily apparent from the face of the

Amendment, but is found in the terms of Purchase Contracts, which provide that "[w]e [DPCC]

purchase and you [A123] supply the good/services designated below" (B628), "[t]he Supplier

shall provide [DPCC] with the parts required for series production and spare parts as specified in

this Agreement" (B628); and "[t]he pricing is valid for a delivery of up to 100,000 batteries a

year.  Exceeding volumes will be newly negotiated" (B644).   Michigan law recognizes that sales

contracts may measure quantity based on a seller's output or a buyer's requirements, providing as

follows:

> Output, requirements.  A term which measures the quantity by the output of the seller
> or the requirements of the buyer means such actual output or requirements as may
> occur in good faith, except that no quantity unreasonably disproportionate to any
> stated estimate or in the absence of a stated estimate to any normal or otherwise
> comparable prior output or requirements may be tendered or demanded.

Mich. Comp. Laws Ann. § 440.2306(1).  The statute's comments further explain:

> Under this Article, a contract for output or requirements is not too indefinite since it
> is held to mean the actual good faith output or requirements of the particular party.
> Nor does such a contract lack mutuality of obligation since, under this section, the
> party who will determine quantity is required to operate his plant or conduct his
> business in good faith and according to commercial standards of fair dealing in the
> trade so that his output or requirements will approximate a reasonably foreseeable
> figure.

15

*Id.,* cmt. 2. I conclude that the Purchase Contracts, considered with the attached Terms and Conditions, sufficiently state the quantity of the agreement as a requirements contract. A123 was required to provide the amount needed for "series production" with an estimate of up to 100,000 units. *See Johnson Controls, Inc. v. TRW Vehicle Safety Sys., Inc.,* 491 F.Supp.2d 707 (E.D.Mich. 2007) (deciding that the using term "AS REL." on purchase orders between the buyer and seller of automotive parts sufficiently stated a quantity, since there was no dispute that the term referenced material releases issued by the buyer periodically that would specify an exact quantities of parts needed).

The Amendment and related documents pass muster under the statute of frauds. Every document that makes up the written agreement need not be signed; those writings may be made at different times. As one Michigan Court noted:

> However, "[a] 'note or memorandum' may be sufficient to satisfy the requirements of the statute of frauds even though it consists of several separate papers and documents, not all of which are signed by the party to be charged, and none of which is a sufficient memorandum in itself." 4 Corbin, Contracts (rev ed), §23.3, p. 771. "It is well settled that the memorandum may be made at any time, at least up to the time the action is brought to enforce the contract." *Id.* at §22.8, p. 743. Thus the writing requirement of the statute of frauds may be satisfied by several writings made at different times.

*Kelly-Stehney & Assoc., Inc. v. MacDonald's Indus. Prod., Inc.,* 265 Mich. App. 105, 113-14, 693 N.W.2d 394 (Mich. Ct. App. 2005).

The Amendment, together with the Purchase Contracts and their attachments, provide unequivocal evidence of a binding, enforceable requirements contract between A123 and DPCC.

(2)    <u>There are genuine issues of material fact regarding the term of the contract</u>

The Trustee argues that any contract between DPCC and A123 was a one-year contract because the Purchase Contracts expressly state: "Annual Purchase Contract is valid from 1/1/2012 to 12/31/2012."[13]

DPCC argues that the undisputed facts demonstrate that the Purchase Contracts were long-term contracts requiring A123 to supply Starter Batteries to Daimler through at least 2017. A representative of DPCC testified in a deposition that the one-year term appearing on the Purchase Contracts was a mistake. (B275:8 - B276:4.) DPCC points out that the Purchase Contracts include terms that are inconsistent with a one-year term, such as unit prices that provide for a "line item validity period until: 12/31/2017" (B634), a "3YP" provision that guarantees replacement parts at a fixed price for three years following the end of a series production (B632), and pricing for "delivery of to 100,000 batteries *a year*," which implies a multi-year agreement (B644). Further, DPCC argues that the parties' course of performance, course of dealing and the standards of custom and usage in the automotive industry provide evidence that the parties' intended a long-term requirements contract.

It is implausible that the parties intended to confirm a contract on December 10, 2012 that would terminate on December 31, 2012, but the relevant, conflicting documents are insufficient to determine on this record the intended length of the requirements contract between DPCC and A123. DPCC's motion for summary judgment regarding the length of the contract will be denied.

---

[13]Both Purchase Contracts that were attached to the A123 email as the "latest" version of the contracts that were agreed to be valid and enforceable had a term of 1/1/2012 to 12/31/2012. (B628, B648.) An earlier version of the First Purchase Contract stated the term as 5/1/2011 to 12/31/2011.

*CONCLUSION*

For the reasons set forth above, I conclude that DPCC and A123 were parties to a binding and enforceable requirements contract in which A123 would supply Starter Batteries to DPCC. However, there are issues of material fact regarding the length of that contract. Accordingly, DPCC's Summary Judgment Motion will be granted, in part, and denied, in part. The Trustee's Cross-Motion for Summary Judgment will be denied.

An appropriate order follows.


BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY JUDGE

Dated: July 24, 2015