## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | : | CHAPTER 11 |
|  | : | (Jointly Administered) |
| B456 SYSTEMS, INC, *et al.*,[1] | : |  |
|  | : | Case No. 12-12859 (KJC) |
| Debtors | : | (D.I. 1318) |
|  | : |  |

## OPINION[2]

## BY: KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE

Before the Court is the objection filed by the Official Committee of Unsecured Creditors (the "Claim Objection") to the proof of claim filed by Daimler Purchasing Coordination Corp. ("DPCC") for damages arising from the Debtors' rejection of DPCC's contract with A123 Systems, Inc. ("Old A123").[3] For the reasons set forth below, the Claim Objection will be sustained, in part, and the parties will be directed to confer concerning recalculation of DPCC's claim in accordance with the Court's conclusions.

### Uncontested Facts[4]

Old A123 manufactured and supplied batteries for electric and hybrid-electric vehicles. In 2010, Daimler and Old A123 began negotiations for the manufacture and supply of lithium-ion starter batteries (the "Starter Batteries") for use in certain Mercedes-Benz car lines.

---

[1] The debtors in these chapter 11 cases are B456 Systems, Inc. (f/k/a A123 Systems, Inc.), A123 Securities Corporation, and Grid Storage Holdings LLC (the "Debtors").

[2] This Opinion constitutes the findings of fact and conclusions of law, as required by Fed. R. Bankr. P. 7052. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and §157(a). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (B).

[3] DPCC is a United States-based purchasing affiliate of Daimler AG ("Daimler"), a German original equipment manufacturer.

[4] The parties filed a Joint Pretrial Memorandum (D.I. 2412) ("JPM") on May 10, 2017, which included a recitation of the procedural background of this matter and a statement of uncontested facts. The facts and background set forth in this section are taken from the uncontested facts in the JPM.

Daimler issued a requirements contract to DPCC for the purchase and supply of 60Ah and 80Ah Starter Batteries.[5] DPCC, in turn, issued a requirements contract to Old A123 for the purchase and supply of the 80Ah and 60Ah Starter Batteries that would be delivered to Daimler's plants. Specifically, DPCC sent proposed purchase contracts to Old A123 in May 2011 and November 2011 (the "Purchase Contracts"). The parties signed an amendment in December 2012 (the "Amendment"), which expressly modified certain terms of the Purchase Contracts.[6]

As part of the Contract, Old A123 and Daimler agreed that Old A123 would be reimbursed over time for certain upfront nonrecurring engineering and development costs associated with the Starter Batteries (known as "NRE Costs") through a "piece price amortization." The parties determined an amount that was added to the base price for each Starter Battery (the "NRE Adder") that would reimburse Old A123 for the NRE Costs.

The Debtors filed chapter 11 bankruptcy petitions on October 16, 2012 (the "Petition Date"). On December 11, 2012, the Court entered an order approving the sale of substantially all of the Debtors' assets to Wanxiang American Corporation (D.I. 640) (the "Sale Order"). Under the terms of the sale to Wanxiang, Old A123's name was changed to A123 Systems, LLC ("New A123").

---

[5] 80Ah (or 80 amp hours) and 60Ah (or 60 amp hours) refers to two different size Starter Batteries that were to be manufactured and supplied by Old A123 under the Contract (defined below).

[6] In cross-motions for summary judgment, the Trustee disputed whether there was an enforceable contract between DPCC and Old A123. By Order and Opinion dated July 24, 2015, I decided that A123 and DPCC were parties to a binding and enforceable requirements contract under which Old A123 would supply Starter Batteries to DPCC for use by Daimler. *In re B456 Systems, Inc.,* No. 12-12859, 2015 WL 4512070 (Bankr. D. Del. July 24, 2015) (the "2015 Decision").

As discussed in more detail in the section entitled "Facts Related to the Term of the Contract," *infra,* DPCC issued more than one purchase contract to Old A123 as the parties negotiated and changed the terms of the deal. Based on the 2015 Decision and the evidence now before me, I conclude that the Purchase Contracts attached in Joint Exhibit J104, together with the Amendment, make up the "Contract" at issue here. Those Purchase Contracts also reference purchase contract number 1285702867, issued by Daimler to DPCC, located in Joint Exhibit J074, which is also the operative purchase contract between Daimler and DPCC in the matter now before me.

On February 13, 2013, the Court entered an Order Authorizing the Debtors' Rejection of Certain Unexpired Leases and Executory Contracts (D.I. 1029) (the "Rejection Order"). The Rejection Order further provided that "[a]ll executory contracts to which the Debtors are a party and which are not listed on Exhibits A or B hereto (the "Rejected Contracts") are hereby rejected, effective as of the date of this Order."[7]

After the sale of the business, DPCC and New A123 entered into a series of purchase contracts for the Starter Batteries. In September 2014, Daimler began purchasing Starter Batteries directly from New A123. DPCC made its final purchase from New A123 in March 2015. DPCC does not have a current purchase contract with New A123.

On March 11, 2013, DPCC filed a proof of claim in the amount of $25.5 million (Claim No. 770) (the "Claim") for damages resulting from the Debtors' rejection of the Contract. On March 29, 2013, the Official Committee of Unsecured Creditors (the "Committee') filed an objection to the Claim (D.I. 1318) (the "Claim Objection") on the grounds that the Claim failed to attach supporting documentation and, therefore, failed to comply with Bankruptcy Rule 3001.

On May 20, 2013, the Court entered an Order confirming the Modified First Amended Joint Plan of Liquidation of B456 Systems, Inc., (the "Plan") (D.I. 1675-4). The Plan established a Liquidation Trust and, pursuant to Section 9.01(b) of the Plan, the Liquidation Trustee was charged with prosecuting any claim objections filed by the Debtors and the Committee, including this Claim Objection.

---

[7] In the Debtors' Motion for Entry of an Order Authorizing Rejection of Certain Unexpired Leases and Executory Contracts (D.I. 895) (the "Rejection Motion"), the Debtors stated, "[t]he Debtors and their professionals have used their best efforts to identify and list on Exhibit C to the Proposed Order all Rejected Contracts. However, to the extent the Debtors have inadvertently failed to include a Rejected Contract on Exhibit C, the Debtors request that any order granting this Motion be deemed to apply to such Rejected Contract." (Rejection Motion, ¶8 (footnote omitted)).

On August 2, 2013, the Court entered a scheduling order for the Claim Objection (D.I. 1992), which bifurcated the proceedings. The first issue had two parts: (i) whether there was a binding and enforceable contract between A123 and DPCC, and (ii) if so, whether the contract was a requirements-based contract with a six-year term (the "Contract Issues"). The second issue requires the Court to fix the amount of the Claim.[8] The parties filed cross-motions for summary judgment on the Contract Issues.

By Order and Opinion dated July 24, 2015, I decided that Old A123 and DPCC were parties to a binding and enforceable requirements contract under which Old A123 would supply Starter Batteries to DPCC for use by Daimler.[9] However, I also determined that conflicting documents raised issues of material fact about the length of the contract.[10]

At a status hearing on August 13, 2015, the parties informed the Court that they agreed to collapse the remaining issues (*i.e.,* (i) the length of the contract between DPCC and Old A123, and (ii) the amount of DPCC's claim (the "Remaining Issues")) into one consolidated evidentiary hearing. On December 10, 2015, the Court entered a second scheduling order (D.I. 2325), setting a limited discovery schedule and setting a mediation conference regarding the Remaining Issues. Mediation was unsuccessful.

On May 15, 16, 17 and 19, 2017, the Court held an evidentiary hearing on the Remaining Issues. After the hearing, the parties submitted proposed findings of fact and conclusions of law.

## Discussion

DPCC filed its proof of claim in the amount of $25,530,912, for damages arising from the Debtors' rejection of the Contract, including the following: (i) cover damages, including damages

---

[8] The 2015 Decision, 2015 WL 4512070 at *5.
[9] *Id.* at *9.
[10] *Id.*

4

under Section 2-712 of the Uniform Commercial Code, totaling $25,108,942.65; and (ii) incidental damages, including damages under Section 2-715 of the Uniform Commercial Code, totaling $421,970. The Trustee argues that DPCC's claim is significantly inflated because (i) the Contract expressly provided for a one-year term, rather than a multi-year term; (ii) DPCC calculated its claim for cover damages on overstated inputs and unwarranted assumptions, including outdated projections for the number of batteries purchased, spare parts costs, and freight charges; and (iii) DPCC advocates use of an inappropriate discount rate and fails to value the claim as of the petition date. The Trustee argues that DPCC's rejection damages claim should be no more than $1,152,035.[11]

(1)    Term of the Contract

    (A)    <u>Findings of facts regarding the term of the Contract</u>

In 2010, Daimler sought a supplier for Starter Batteries for a series production of car lines to be manufactured beginning in 2013.[12] Daimler sent a Request for Quotation ("RFQ") for the Starter Batteries to Old A123 and other suppliers in July 2010.[13] The RFQ stated, in part, "[p]lease quote your feasible [ ] rates/price developments for a *multi-year* agreement on basis of the product life cycle concerning continuous improvement activities."[14] The RFQ contained other terms indicating a request for a multi-year contract, including (for example): (i) a 3YP clause requiring that a supplier provide spare parts for three years following the end of series production

---

[11] At one point, the Trustee advised the Court that he expected distributions to unsecured creditors to result in a 60-65% recovery (Tr. 3/28/2017 at 19:22 - 20:11), hence, the divide between the parties' respective rejection damage claim calculations is economically meaningful.

[12] Tr. 5/15/2017 at 18:8 - 21:25 (D.I. 2433). (Testimony of Paul Ribeiro-Monteiro, the Purchasing Manager for Daimler during the relevant time period. ("Monteiro")). *See* JPM, at 14. "Series production" refers to mass production of a certain type of vehicle. Tr. 5/15/2017 at 21:10 - 21:25 (Monteiro).

[13] Tr. 5/15/2017 at 22:14 -- 23:18 (Monteiro). Joint Exs. J002, J003.

[14] Joint Ex. J002 at B456LT00001244 (emphasis added).

at the last year's series production price;[15]  and (ii) "CIP" or continuous improvement process rates which are "peculiar to the automotive industry" requiring a supplier who is building a part and receives a multi-year contract to provide for a price decrease that is "supposed to happen twice a year over the term of the contract."[16]

On September 1, 2010, Old A123 sent Daimler a response to the RFQ (the "Response").[17] The "Commercial Proposal" in the Response set forth prices for 80Ah and 60Ah batteries, setting a price per unit for each year during the period of 2013 through 2017.[18]  The Commercial Proposal also included CIP price decreases as requested in the RFQ.[19]  Throughout the negotiations between Daimler and Old A123 for the Starter Batteries, Old A123 quoted prices for the period of 2013 - 2017.[20]

Daimler and Old A123 also negotiated the amount for the non-recurring engineering costs (or "NRE Costs") and the terms of NRE recovery.[21] Generally, Daimler reimburses a supplier for NRE Costs over a period of years through a "piece price amortization," that is, amortizing the agreed-upon NRE Costs over a chosen time period by adding part of the NRE Costs to the base price of a product.[22]  The parties agreed that Old A123 would recover NRE Costs over multiple years during series production.[23]

---

[15]  Joint Ex. J002 at B456LT00001243. Tr. 5/15/2017 at 26:17 - 27:9 (Monteiro).
[16]  Tr. 5/15/2017 at 29:1 - 29:15 (Monteiro).
[17]  Joint Ex. J007.
[18]  Joint Ex. J007 at B456LT00001002.  Old A123 listed alternative prices for the batteries based on whether the volume of batteries to be provided was 25,000/year or 50,000/year. *Id.*
[19]  *Id.*
[20]  *See, e.g.,* Joint Ex. J010 at 28; Joint Ex. J017 at B456LT00010603; and Joint Ex. J024.
[21]  Tr. 5/15/2017 at 51:3 - 53:5, 53:16 - 54:18 (Monteiro); and Joint Ex. J025.
[22]  Tr. 5/15/2017 at 37:9 - 38:23 (Monteiro).
[23]  Tr. 5/15/2017 at 53:20 - 54:18; *See* Joint Ex. J083 and Joint Ex. J084.

In December 2010, Old A123 was nominated to be Daimler's supplier of the Starter Batteries.[24] In the confirmation between Daimler and Old A123, the parties agreed to a price line from 2013 through 2017, recovery of NRE Costs over multiple years of series production, and Daimler's 3YP Policy for end of series production ("EOP").[25] Following nomination, Old A123 and Daimler immediately began working on the development of the Starter Batteries to meet the 2013 start of production ("SOP") date.[26]

On April 7, 2011, Daimler issued a purchase contract to DPCC for the 80Ah Starter Batteries.[27] The Daimler purchase contract states that it has a validity period until 12/31/2017.[28] On May 5, 2011, DPCC, in turn, issued a purchase contract to Old A123 for the 80Ah Starter Batteries (the "First Purchase Contract").[29] On its first page, the First Purchase Contract states "Annual Purchase Contract is valid from 06/27/2011 to 12/31/2011."[30] However, on a later page, the First Purchase Contract identifies the Starter Battery parts and states "Line item validity period until 12/31/2017" and also "Price valid: 06/27/2011 - 12/31/2011."[31]

After DPCC issued the First Purchase Contract, Old A123 indicated that it had to increase the price of the 80Ah Starter Batteries.[32] Daimler felt pressured to renegotiate with Old A123 to prevent the entire project from stalling.[33] In September 2011, executives of Daimler and Old A123

---

[24] Joint Ex. J033.

[25] Joint Ex. J032.

[26] Tr. 5/15/2017 at 62:24 - 63:9 (Monteiro).

[27] Joint Ex. J047.

[28] *Id.* at DPCC003310.

[29] Joint Ex. J052, identifying the contract as Purchase Contract 6900061. Daimler had "purchasing guidelines [requiring] any kind of supply contracts with American U.S. suppliers . . . to go via Purchasing Coordination. At least those regulations existed at the time." Tr. 5/15/2017 at 67:8 - 67:12 (Monteiro).

[30] Joint Ex. J052 at B456LT00001744.

[31] *Id.* at B456LT00001750.

[32] *See* Joint Ex. J0057. This internal Old A123 email indicates that Daimler's representative "was very upset with our 'post-nomination' behavior and the huge price increase." *Id.* at B456LT00001445.

[33] Tr. 5/15/2017 at 68:20 - 69:11; 70:25 - 71:12 (Monteiro).

met at Old A123's facilities in Livonia, Michigan to discuss the contract terms.[34]  The parties

agreed to revised contract terms for the Starter Batteries.[35]  Notes from the meeting show that the

parties agreed to new prices for 80Ah and 60Ah Starter Batteries for the period 2013 to 2017, and

changes to the amortization of the NRE Costs, among other things.[36]  After the Livonia meeting,

Daimler issued revised purchase contracts to DPCC for 80Ah and 60Ah Starter Batteries.[37]

DPCC likewise issued revised purchase contracts to Old A123 for the 80Ah and 60Ah Starter

Batteries (the "Updated Purchase Contracts").[38]

> 60Ah Starter Batteries:  Purchase Contract 6900067 dated 11/15/2011 between DPCC and
> Old A123 states that the "Annual Purchase Contract is valid from 1/1/2012 to 12/31/2012"
> and the page containing the prices for the 60Ah Starter Batteries states "line item validity
> period until: 12/31/2017" and "Price Valid: 6/2/2011 to 12/31/2011."[39]  The contract also
> includes an "Agreed price adjustment" provision, indicating agreed reductions in price
> between 2012 and 2017.[40]

> 80Ah Starter Batteries:  Purchase Contract 6900061 dated 05/05/2011 between DPCC and
> Old A123 states that the "Annual Purchase Contract is valid from 1/1/2012 to 12/31/2012"
> and the page containing the prices for the 80Ah Starter Batteries states "line item validity
> period until: 12/31/2017" and "Price Valid: 6/27/2011 - 12/31/2011."[41]  The contract also
> includes an "Agreed price adjustment" provision, indicating agreed reductions in price
> between 2012 and 2017.[42]

---

[34] 2015 Decision, 2015 WL 4512070 at 3.  Tr. 5/15/2017 at 74:18 - 75:16 (Monteiro).

[35] Ex. P007.  Tr. 5/15/2017 at 76:2 - 81:12 (Monteiro).

[36] Ex. P007.

[37] Joint Ex. J072 and Joint Ex. J074.

[38] Joint Ex. J104.  The Updated Purchase Contracts are dated November 15, 2011 (for Purchase Contract 6900067 for 60Ah Starter Batteries) and May 5, 2011 (for Purchase Contract 6900061 for 80Ah Starter Batteries).  Due to a system restriction, once the purchase contract is initiated, DPCC could not change the date as updated purchase contracts were issued.  Tr. 5/16/2017 at 97:2 - 97:18 (Testimony of Margarita Block, the Purchasing Manager for DPCC at the relevant time period ("Block")).  See JPM at 14.

[39] Joint Ex. J104 at B456LT00005674, B456LT00005680.  Previously, on November 15, 2011, DPCC had issued the original purchase contract for the 60Ah Starter Batteries, stating that it was an "Annual Purchase Contract" valid from 6/27/2011 to 12/31/2011.  Joint Ex. J066.

[40] Joint Ex. J104 at B456LT00005679

[41] Joint Ex. J104 at B456LT00005690, B456LT00005696. Like the date of the Contract (see n. 38, supra) the statement appearing below each price of "Price valid 6/27/2011 - 12/31/2011" appears to be a term that was never updated in the contract, as it is outdated whether finding that the term ended on December 31, 2012 or December 31, 2017.  J104 at B456LT00005680, B456LT00005696.

[42] Joint Ex. J104 at B456LT00005695.

The Updated Purchase Contracts also include an "Onward Delivery" provision, permitting DPCC to extend the Contract for the batteries for another year and "the prices most recently agreed between the parties shall remain valid," although if DPCC extends the term, both parties have the right to terminate the Contract, in writing, not earlier than June 30 of the following year and on at least six months' notice.[43]

On December 10, 2012, DPCC and Old A123 signed an "Amendment to Purchase Contracts" (the "Amendment") setting forth DPCC's agreement to pay $280,000 to Old A123 "for third party testing required under the Contracts that DPCC, in its sole discretion, deems critical to meet applicable production schedules."[44]   The Amendment acknowledged that the "Contracts continue in full force and effect except to the extent expressly amended by this Amendment."[45]   In the 2015 Decision, I wrote that "[t]he Amendment, together with the Purchase Contracts and their attachments, provide unequivocal evidence of a binding, enforceable requirements contract between [Old] A123 and DPCC."[46]   However, genuine issues of material fact prevented summary judgment on the issue of the term of the Contract.

(B)   Discussion regarding the term of the Contract

The Trustee's position on the term of the Contract is straight-forward:  The Purchase Contracts expressly stated that their terms expired on December 31, 2012, and the contracts were not extended or renewed beyond that date.  The Trustee claims that the parties contemplated a multi-year agreement through a series of one-year renewable purchase contracts, but in 2013 DPCC did not issue a new annual contract to Old A123.   Thus, the Trustee argues, DPCC did

---

[43] Joint Ex. J104 at B456LT00005678-79, B456LT00005694-95.
[44] Joint Ex. J111 at DPCC000073.  The Amendment defines the "Contracts" as including Purchase Contracts dated November 29, 2012 (No. 1285703299), November 15, 2011 (No. 6900067), and May 5, 2011 (No. 6900061).
[45] Joint Ex. J111 at DPCC000074.
[46] 2015 Decision, 2015 WL 4512070 at *9.

not suffer any damages as a result of Old A123's rejection of the Contract because the Contract was rejected *after* the term expired, and DPCC's claim should be denied in its entirety.

DPCC, on the other hand, contends that the Trustee's argument rests on a single line in a contract and does not take into account the terms of the agreement as a whole or the parties' course of performance, both of which demonstrate that the Contract is a multi-year contract to supply Starter Batteries through 2017, with an option to extend the Contract through 2018.

Under Michigan law,[47] "if two provisions of a contract irreconcilably conflict with each other, the language of the contract is ambiguous."[48] "Further, courts cannot simply ignore portions of a contract in order to avoid a finding of ambiguity or in order to declare an ambiguity. Instead contracts must be construed so as to give effect to every word or phrase as far as practicable."[49]

A review of the entire contract shows that its express terms are contradictory. Despite stating that the "Annual Purchase Contract is valid from 1/1/2012 to 12/31/2012," the Updated Purchase Contracts also include the following provisions that indicate the parties' agreement to a term that is longer than one year:

(1)     the "Subject Matter of the Agreement" states that "The Supplier [Old A123] shall provide Daimler Purchasing Coordination Corp. (DPCC) with the parts required for *series production* and spare parts as specified in this Agreement;"[50]

(2)     the "3 Year Policy" (or "3YP") provision for spare parts required Old A123 to provide spare parts "[a]fter the end of delivery for series

---

[47] The DPCC "General Terms and Conditions" attached to the Contract provide that "all transactions between DPCC and Seller will be governed by and construed in accordance with the laws of Michigan as if entirely performed therein." Joint Ex. J104 at B456LT00005688, B456LT00005704. Neither party disputes that Michigan law applies here.

[48] *Klapp v. United Ins. Grp. Agency, Inc.,* 468 Mich. 459, 467, 663 N.W.2d 447, 453 (Mich. 2003) quoting *Hunter v. Pearl Assurance Co., Ltd.,* 292 Mich. 543, 545, 291 N.W. 58 (Mich. 1940) (internal punctuation omitted).

[49] *Id.*

[50] Joint Ex. J104 at B456LT00005674 and B456LT00005690 (¶1.a) (emphasis added).

production" at a price fixed for a period of three years "calculated from the most recently applicable series production price plus the costs actually incurred by the Supplier for special packaging;"[51]

(3)     the "Agreed price adjustment" paragraph setting forth agreed price decreases in 2015, 2016, and 2017;[52] and

(4)     Pricing for each battery is listed with having a "Line item validity period until 12/31/2017."[53]

"When contractual language is ambiguous, a fact-finder's primary objective is to ascertain the intentions of the parties."[54]  A court can consider relevant extrinsic evidence to aid in the interpretation of ambiguous contractual language without violating the parol evidence rule.[55]

If the contract in question were ambiguous or doubtful, extrinsic evidence, particularly evidence which would indicate the contemporaneous understanding of the parties, would be admissible as an aid in construction of the disputed terms.

The law is clear that where the language of the contract is ambiguous, the court can look to such extrinsic evidence as the parties' conduct, the statements of its representatives, and past practices to aid in interpretation.[56]

At trial, DPCC presented evidence demonstrating that the parties contemplated a multi-year contract throughout their negotiations in 2010 and 2011 concerning the Contract:

- The RFQ for the Starter Batteries asked for a binding offers from suppliers, including a quote for "feasible CIP rates/ price developments for a *multi-year agreement* on basis of the product life cycle concerning continuous improvement activities."[57]

- The parties negotiated recovery of the NRE development costs over a period of years in a multi-year contract through a "piece price amortization."[58]

---

[51] Joint Ex. J104 at B456LT00005678, B456LT00005694.
[52] Joint Ex. J104 at B456LT00005679, B456LT00005695.
[53] Joint Ex. J104 at B456LT00005680, B456LT00005696.
[54] *Whitesell Corp. v. Whirlpool Corp.,* No. 1:05-CV-679, 2009 WL 3585427, *1 (W.D. Mich. Oct. 27, 2009) (citing *Klapp,* 663 N.W.2d at 454).
[55] *Klapp,* 663 N.W.2d at 454
[56] *Id.* quoting *Penzien v. Dielectric Products Eng'g Co., Inc.,* 374 Mich. 444, 449, 132 N.W.2d 130 (Mich. 1965) (internal punctuation omitted).
[57] Joint Ex. J002 at B456LT00001243-44 (emphasis added).
[58] Tr. 5/15/2017 at 37:9 - 38:8; 51:3 - 54:18 (Monteiro).

- After Old A123 was nominated for the Contract in 2010, the parties' development teams immediately began working on the Starter Batteries so they could meet the anticipated rollout or start of production dates in 2013.[59]

- Old A123's internal communications, as well as communications with DPCC, in November and December 2010 always contained a price line for 80Ah and 60Ah Starter Batteries from 2013 to 2017.[60]

- After negotiations at the September 2011 meeting in Livonia, Michigan, DPCC agreed to pay Old A123 higher prices for the Starter Batteries for the period of 2013 through 2017, which were summarized contemporaneously at the meeting by Mr. Monteiro in an Excel spread sheet.[61] For the most part, the prices in the Contract matched the pricing structure agreed to at the Livonia meeting.[62]

DPCC also presented testimony showing that everyone involved in negotiating and carrying out the Contract for the Starter Batteries understood it to be a multi-year deal:

- Mr. Monteiro testified that Daimler viewed the Contract as a having a 5-year term from 2013 through 2017.[63]

- Ms. Block testified that the Contract extended to 2017 and explained that the one-year term stated on the first page of the Contract was an error.[64]

---

[59] Joint Ex. J029; Tr. 5/15/2017 at 62:24 - 63:9 (Monteiro).

[60] Joint Exhibits J010 at 28, 31; J011 at B456LT00000428; J031 at B456LT00003839.

[61] Ex. P007; Ex. P008; Ex. P012; Tr. 5/15/2017 74:18 - 76:14; 77:1 - 77:7 (Monteiro).

[62] Ex. P008; Joint Ex. J104. Although the prices for the 80Ah Starter Batteries appear to be higher in the Contract than in the Livonia documentation, Mr. Monteiro explained that the price in the Contract for the 80Ah Starter Batteries include the $477 base price, plus $12 piece price amortization for NRE Costs which the parties decided would be added to only the 80Ah Starter Batteries. Tr. 5/15/2017 at 98:12 - 99:16 (Monteiro).

[63] Tr. 5/15/2017 at 34:4 - 34:15; 48:20 - 49:9; 53:16 - 54:18; 65:2 - 65:10; 80:12 - 80:15 (Monteiro).

[64] Tr. 5/16/2017 at 97:2 - 99:8; 101:25 - 102:6 (Block). The Trustee argues that the one-year term in the Contract between DPCC and Old A123 was not an error, because it mirrors the language in the contract between Daimler and DPCC, providing:

This Agreement has a term of one year and shall be extended by an additional year, respectively, if the parties have agreed the prices for the subsequent year. (Joint Ex. J047 at DPCC003313).

The one-year term language, however, is not found in the later Daimler/DPCC purchase contracts issued on December 7, 2011 (Joint Ex. J072) and on January 24, 2012 (Joint Ex. J074), which provided the basis for the Updated Purchase Contracts between DPCC and Old A123.

- Samuel Trinch, Old A123's Vice President of Automotive Sales, testified at his deposition that Old A123 provided DPCC with multi-year pricing for the Starter Batteries through the series production.[65]

- Rex Belden, the Program Manager for the Starter Batteries at Old A123, testified at his deposition that the parties were going to do business through 2017.[66]

DPCC further argues that the Trustee's claim that the parties intended to enter into a one-year contract is contradicted by the parties' course of performance. The Uniform Commercial Code ("UCC") allows evidence of the parties' course of performance to explain or supplement a written agreement.[67] "[T]he course of actual performance by the parties is considered the best indication of what they intended the writing to mean."[68] The UCC defines "course of performance" as:

[A] sequence of conduct between the parties to a particular transaction that exists if both of the following are met:
    (a)    The agreement of the parties with respect to the transaction involves repeated occasions for performance by a party.
    (b)    The other party, with knowledge of the nature of the performance and opportunity for objection to it, accepts the performance or acquiesces in it without objection.[69]

DPCC argues that the parties' course of performance after issuance of the Updated Purchase Contracts indicates that both sides intended a long-term contract for the full series production. The following conduct supports a finding that the parties did not intend or expect the Contract to expire on December 31, 2012:

- Both parties invested millions of dollars in their respective facilities to prepare for the Starter Battery program.[70]

---

[65] Dep. Tr. 10/14/2013 at 41:1 - 43:11; 44:15 - 45:5; 49:17 - 50:25 (Trinch).
[66] Dep. Tr. 10/16/2013 at 92:6 - 92:11; 99:15 - 99:20 (Belden).
[67] Mich. Comp. Laws § 440.2202.
[68] Mich. Comp. Laws § 440.2202, cmt. 2.
[69] Mich. Comp. Laws §440.1303(1).
[70] Joint Ex. J070; Dep. Tr. 2/4/2014 at 143:17 - 144:6 (Jason Forcier ("Forcier") was the Executive Vice President of the Automotive Solutions Group at Old A123 during the relevant time period. *See* JPM at 16.).

- In late November 2012, Daimler conducted a "Line Readiness Audit" of Old A123's facilities to ensure that Old A123's production line was ready for SOP.[71]

- On December 10, 2012, a few weeks after the Line Readiness Audit, the parties signed the Amendment by which $280,000 in NRE Costs were pulled forward to fund certain critical testing that Old A123 could not finance, all so that development of the Starter Battery would remain on track for SOP.[72]

- In December 2012, DPCC was setting up Old A123 on the electronic data interchange ("EDI"), which was a system allowing Old A123 to receive orders and payments from Daimler for the Starter Batteries.[73] EDI was only used for "production material suppliers that had frequent and ongoing shipments over long periods of time."[74] The process of setting up Old A123 on the EDI system continued into January 2013.[75]

Based on the evidence before me, I conclude that the parties intended to enter into a multi-year agreement for Old A123 to supply Starter Batteries for Daimler's series production through 2017. This was understood by representatives of both DPCC and Old A123. Evidence of the parties' intent is reinforced by their course of performance in December 2012 when the parties invested more money, signed the Amendment and, in every appearance, were forging ahead to meet SOP. These activities did not in any way indicate that the parties expected the Contract to terminate at the end of 2012. The evidence before me indicates that the parties intended the Contract to be have a multi-year term ending in 2017.

DPCC further argues that for calculating damages, this Court should determine that the Contract term would have been extended through 2018 pursuant to the provision entitled "Onward Delivery Module," which provides that:

---

[71] Dep. Tr. 10/16/2013 at 139:15 - 141:4 (Belden); Joint Exhibits J101, J102.
[72] Joint Ex. J111; Dep. Tr. 10/16/2013 at 141:9 - 142:2 (Belden); Joint Exhibits J095 at B456LT00005170; J099; J103 at B456LT00035648
[73] Joint Ex. J117; Tr. 5/16/2017 at 92:25 - 94:5 (Block).
[74] Tr. 5/16/2017 at 94:6 - 94:10 (Block).
[75] Tr. 5/16/2017 at 100:16 - 102:6 (Block).

> If DPCC wishes to continue the Supply Agreement after the end of the term
> for the relevant part number, but, during the term of this Agreement, the
> parties are unable to agree on a valid price for the period after the end of
> this Agreement, the Agreement for this part number shall be extended for
> another year and the prices most recently agreed between the parties shall
> remain valid. In such a case, both parties shall be entitled to terminate in
> writing the Agreement concerning the relevant part number by June 30 of
> the following year at the earliest with a notice period of at least six months
> to the end of the month.[76]

The Trustee counters that, when calculating rejection damages, a Court should not assume that

parties will exercise a future option to extend a contract.[77] When considering whether an option

to extend a contract should be included in calculating rejection damages, a court may find that the

future extension may be too remote or speculative.[78] DPCC asserts that, due to the passage of

time, we need not guess whether Daimler would have exercised the option to extend the Contract.

Mr. Monteiro testified that in the "actual world" (*i.e.*, what actually happened after rejection of

the Contract), Daimler has opted to continue purchasing the Starter Batteries through mid-2018

under its contract with New A123.[79] After that time, Daimler expects to begin using a new

generation of Starter Batteries.[80] The decision about whether to extend the Contract rested solely

with DPCC.[81]

---

[76] Joint Ex. J104 at B456LT00005678-79, B456LT00005694-95.

[77] In support, the Trustee cites to *In re Weaver Oil Co., Inc.,* No. 08-40379, 2008 WL 8202063, *4 (Bankr. N.D. Fla. Nov. 17, 2008), in which the Court, deciding whether to approve rejection of a contract, considered whether the size of the resulting rejection damages claim prevented the estate from benefiting from the contract rejection. Without any discussion on the issue, the Court determined the potential rejection damages claim without including an option to extend the contract for a further five-year term.

[78] *See In re Henderson,* 297 B.R. 870, 874 (Bankr. M.D. Fla. 2003) (Court considering a landlord's rejection damages claim against the debtor-guarantor of the lease obligation would not reduce the rent claim based on the assumption that the replacement tenant would exercise options to renew the lease).

[79] Tr. 5/15/2017 at 94:13 - 96:9 (Monteiro).

[80] *Id.*

[81] Tr. 5/17/2017 at 123:18 - 124:44 (D.I. 2439) (Jeffrey Johnston, DPCC's expert witness on damages calculation ("Johnston"); *See* JPM at 14; Tr. 5/17/2017 at 16:4 - 16:21 (Johnston).

Because Daimler did, indeed, extend its contract with New A123, there is no need to speculate. The record supports a finding that the Contract would have been extended for six months through mid-2018.

(2)     Calculation of DPCC's Damages under the Contract

    (A)     Findings of fact related to Contract damages

After filing its chapter 11 case, Old A123 sold most of its assets to New A123, and rejected its Contract with DPCC. Because the SOP date was closing in, and because the parties had already expended considerable costs and effort on the project, DPCC and Daimler felt pressured to negotiate with New A123 to supply the Starter Batteries.[82]  New A123 supplied the Starter Batteries to Daimler for the series production, but New A123 imposed a substantial price increase, raising the base price, the NRE Adder and the freight charges.[83]  The parties made some minor technical changes to the batteries over the life of the contract.[84]

Except for pricing, the contracts with New A123 contained similar terms as those used in the contracts with Old A123, including a term through December 31, 2017, an "onward delivery" provision and the "3 Year Policy" provision for spare parts.[85]

Because New A123 charged a higher price for the Starter Batteries, DPCC and Daimler purchased fewer batteries than the originally estimated amount of 37,500 per year.[86]  The increase in price caused Daimler to alter its plan to use the Starter Batteries in the high volume C Class model series production.[87]  Instead, the batteries were purchased for use in lower volume models.

---

[82] Tr. 5/15/2017 at 99:24 - 102:23 (Monteiro); Exhibit P31.

[83] Tr. 5/15/2017 at 103:2 - 104:24 (Monteiro).

[84] Tr. 5/15/2017 at 110:12 - 111:13; 112:14 - 113:14 (Monteiro).

[85] Compare Joint Ex. J104 and Joint Ex. J129.  See also Ex. P031, Ex. P033 and P051.

[86] Tr. 5/16/2017 at 74:11 - 75:7 (Monteiro).

[87] Tr. 5/15/2017 at 21:19 - 21:25; 43:20 - 45:89 (Monteiro); Old A123 knew the price would affect which car lines would use the batteries and, in turn, how many batteries were purchased. Joint Ex. J011 at B456LT0000428 ("[T]he only hurdle to jump over is the price line;" "The platform managers at Daimler

In 2014, Daimler's management switched all contracts that had been handled through DPCC to contracts between Daimler and the suppliers, directly.[88] In September 2014, Daimler entered into a series of purchase contracts with and started purchasing Starter Batteries directly from New A123.[89] DPCC made its final purchase from New A123 in March 2015.[90]

(B)    Discussion regarding Contract damages

Bankruptcy Code § 502(b) provides that if an objection is made to a claim, then "the court, after notice and hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount [subject to certain exceptions, not applicable here].[91] The burden of proof as to the validity of a claim shifts between parties.[92] Here, the Trustee has presented sufficient evidence to rebut the *prima facie* validity of DPCC's claim, so the burden of proof reverts to DPCC to prove the validity of its claim by a preponderance of the evidence.

---

will cancel this technology right away if there is no gap closure"); Joint Ex. J013 at B456LT00004294 ("[T]he platform manager can easily put their veto on this new technology if the price gap is too big.").

[88] Tr. 5/15/2017 at 107:19 - 108:9 (Monteiro).

[89] JPM, Uncontested Facts, ¶ 11. Ex. P33.

[90] JPM, Uncontested Facts, ¶ 12.

[91] 11 U.S.C. § 502(b).

[92] *In re Land Source Cmty. Dev. LLC,* 485 B.R. 310, 317 (Bankr. D. Del 2013) (citing *In re Allegheny Int'l, Inc.,* 954 F.2d 167, 173 (3d Cir. 1992)), which describes the shifting burden of proof as follows:

> Initially, the claimant must allege facts sufficient to support the claim. If the averments in his filed claim meet this standard of sufficiency, it is "*prima facie*" valid. In other words, a claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward. The burden of going forward then shifts to the objector to produce evidence sufficient to negate the *prima facie* validity of the filed claim. It is often said that the objector must produce evidence equal in force to the *prima facie* case....In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence.... The burden of persuasion is always on the claimant.

*Allegheny Int'l*, 954 F.2d at 173-74 (citations omitted).

A bankruptcy court consults state law to determine the validity of a claim.[93]  The rejected

Contract is governed by Michigan law.[94]  Since the Contract is for the sale of goods, the Michigan

Uniform Commercial Code ("UCC") applies.[95]  Remedies under the Michigan UCC "must be

liberally administered to the end that the aggrieved party may be put in as good a position as if

the other party had fully performed . . . ."[96]

UCC Section 2-711 provides that when a seller fails to deliver or repudiates a contract,

the buyer's remedies include (i) "cover," or (ii) recovering damages for nondelivery as provided

in UCC Section 2-713.[97]

UCC Section 2-712, ("Cover"; procurement of substitute goods; buyer's damages)

provides:

(1)    After a breach within the preceding section [UCC Section 2-711] the
buyer may "cover" by making in good faith and without unreasonable
delay any reasonable purchase of or contract to purchase goods in
substitution for those due from the seller.

(2)    The buyer may recover from the seller as damages the difference between
the cost of cover and the contract price together with any incidental or
consequential damages as hereinafter defined (section 2715), but less
expenses saved in consequence of the seller's breach.

(3)    Failure of the buyer to effect cover within this section does not bar him
from any other remedy.[98]

UCC Section 2-713 (Nondelivery or repudiation; buyer's damages) provides:

(1)    Subject to the provisions of this article with respect to proof of market price
(section 2723), the measure of damages for nondelivery or repudiation by

---

[93] *Travelers Cas. & Sur. Co. of America v. Pacific Gas & Elec. Co.,* 549 U.S. 443, 450-51, 127
S. Ct. 1199, 167 L. Ed. 2d 178 (2007) (citing *Raleigh v. Illinois Dept. of Revenue,* 530 U.S. 15, 20, 120 S.
Ct. 1951, 147 L. Ed. 2d 13 (2000)).

[94] Joint Ex. J104 at B456LT00005688, B456LT00005704.

[95] Mich. Comp. Laws §440.2101 *et seq.*

[96] Mich. Comp. Laws §440.1305.

[97] Mich. Comp. Laws 440.2711.

[98] Mich. Comp. Laws 440.2712 (footnote omitted).

the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this article (section 2715), but less expenses saved in consequence of the seller's breach.

(2)     Market price is to be determined as of the place for tender or, in cases of rejection after arrival or revocation of acceptance, as of the place of arrival.[99]

Initially, the Trustee argues that the price of the batteries that DPCC purchased from New A123 cannot be used to determine the "cover" price or "market" price for damages because, the Trustee contends, New A123's batteries had significant technical and performance improvements over the Starter Batteries that were the subject of the Contract.[100]   Comment 2 to UCC Section 2-712 provides that:

The definition of "cover" . . . envisages a series of contracts or sales, as well as a single contract or sale; goods not identical with those involved but commercially usable as reasonable substitutes under the circumstances of the particular case; and contracts on credit or delivery terms differing from the contract in breach, but again reasonable under the circumstances.  The test of proper cover is whether at the time and place the buyer acted in good faith and in a reasonable manner, and it is immaterial that hindsight may later prove that the method of cover used was not the cheapest or most effective.[101]

"Although Comment 2 instructs that the substitute need not be the least expensive cover, nothing in the [UCC] indicates that the buyer is free to pass over an identical substitute and to select his own windfall . . . . Recovery of costs for an improved product depends in part on evidence suggesting a more comparable substitute was not available."[102]

---

[99] Mich. Comp. Laws 440.2713 (footnote omitted).

[100] Tr. 5/17/2017 at 215:8 - 216:24 (Testimony of Dr. Gilbert Neal Riley, Jr., [fill in title].  Dr. Gilbert, a co-inventor of the Old A123 batteries, testified about performance improvements in the Starter Batteries supplied by New A123.

[101] Mich. Comp. Laws 440.2712 cmt. 2.

[102] *Natron Corp. v. Amway Corp*, 1999 WL 33435058, *3 (Mich. Ct. App. Oct. 12, 1999) (citations omitted).  The Trustee cites case law that is easily distinguished from the facts before me.  In *Valley Die Cast Corp. v. A.C. W., Inc.*, 181 N.W.2d 303 (Mich. Ct. App. 1970), the covering party purchased a brush car wash as cover for a pressure car wash.  The brush car wash was more expensive and operated on

New A123 purchased substantially all of the assets of Old A123, which included the technology and manufacturing capability that Daimler and Old A123 had developed specifically for Daimler's series production.  Mr. Monteiro testified that Daimler felt that its only option, especially in light of the time frame for SOP, was to negotiate and buy the Starter Batteries from New A123.  Given the timing and the circumstances, DPCC and Daimler's purchase of substitute batteries - - for the most part, virtually identical batteries - - from New A123 was entirely reasonable, even considering the performance improvements that occurred over time.[103]

Damage Calculations

Both parties relied upon expert witnesses to calculate DPCC's rejection damage claim. The Trustee's expert, Jonathon Vanderveen, calculated the present value of DPCC's damages at $1,152,035 "at most."[104]  DPCC's expert, Jeffrey L. Johnston, calculated the present value of DPCC's damages at $14,915,220.[105]  Although the experts generally applied the same methodology, their damage calculation totals differ significantly because the experts used different information for certain inputs in the damage models.  The issues regarding these inputs are examined below.

(i)    Determining the price delta for the Starter Batteries

The first step in calculating damages requires a determination of the "price delta."  DPCC purchased Starter Batteries from New A123 to "cover" the batteries it could not buy from Old A123 after it rejected the Contract.  Both experts agreed that measuring DPCC's damages starts

---

distinctly different principles from the pressure car wash.  In *IDX Sys. Corp. v. St. John Health Sys.*, 2003 WL 25676069 (E.D. Mich. Mar. 28, 2003), the Court granted a motion in limine to exclude evidence related to damages incurred when a health care company purchased multiple systems to replace the single, integrated software system that it had contracted to buy.  In this matter now before me, no evidence of an alternative source of batteries was produced.

[103] Tr. 5/15/2017 at 110:12 - 111:13: 112:14 - 113:14 (Monteiro).

[104] Joint Ex. J141 at 17.

[105] Joint Ex. J139 at 23.

by calculating the difference between the Starter Batteries' price in the Old A123 Contract and the higher price charged by New A123 (referred to as the "price delta"). The price delta is then multiplied against the number of batteries needed (which is another source of dispute, discussed below).

The Contract price for the Starter Batteries consists of a base price (which includes the NRE Adder) and freight costs.[106] There were so many price changes and new versions of the Purchase Contracts between DPCC and Old A123 that the parties disagree which prices should be used to calculate damages.

One issue here is a price change included in the 2012 Amendment. Because DPCC would be paying "Critical Test Costs" up front, the Amendment reduced the price of "each Battery" to $487.43.[107] The Amendment defines the "Batteries" as "certain Lithium Ion 12V starter batteries," which were the subject of the "Contracts," and the "Contracts" included the Updated Purchase Contracts for both 60Ah and 80Ah batteries.[108]

The experts disagreed about whether the Amendment's price reduction applied only to the 80Ah batteries, or to both the 80Ah and 60Ah batteries. The Trustee's expert applied the change in price to both 80Ah and 60Ah batteries, while DPCC's expert applied the Amendment's price change only to the 80Ah batteries. The Updated Purchase Contracts at J104 show that, for the 2012-2014 period, the 60Ah battery's base price was $448, and the 80Ah battery's base price was $489.30.[109] In December 2012, only the price of the 80Ah battery could be *reduced* to $487.43;

---

[106] Joint Ex. J104 at B456LT00005680, B456LT0005696; Joint Ex. J141 at 4 n. 9; Joint Ex. J139 at 9 (stating that the pricing consisted of three separate components: the base price, the NRE Adder and the delivery charges (or freight costs)).

[107] Joint Ex. J111. This change reduced the NRE Adder from $12.30 to $10.43. Tr. 5/17/2017 at 68:21 - 69:23 (Johnston).

[108] Joint Ex. J111.

[109] Joint Ex. J104 at B456LT00005680, B456LT0005696.

if the change was applied to the 60Ah battery, it would *raise* the price from $448 to $487.43. Further, at the time the Amendment was signed, the parties anticipated that the 60Ah battery would not be available until 2014.[110] Based on the record before me, I conclude that the price change in the Amendment applies only to the 80Ah Starter Batteries. DPCC's expert estimated that this difference caused the Trustee's damages calculation to be understated by as much as $850,000.[111]

The next cost issue arises out of the September 2011 Livonia meeting.[112] There, the parties discussed revised pricing and the use of a cheaper 60Ah battery, which was in development.[113] If the 60Ah battery was not available in 2015, then they agreed that Old A123 would continue shipping the 80Ah battery, but charge the 60Ah base price, which was $412.[114] Because the 60Ah battery was not available until July 2015, and took 6 months to integrate into the production, DPCC's expert's damages calculations reduced the 80Ah battery's price to $412 starting in 2015.[115] The Trustee, however, points out that neither the Updated Purchase Contracts nor the Amendment include that revised term from the Livonia meeting. Mr. Monteiro testified that the purchase contracts issued after the Livonia meeting included some of the revised terms agreed to at the meeting.[116] However, none of the post-Livonia contracts incorporated any agreement about reducing the price of the 80Ah battery to $412 if the 60Ah battery was not delivered in 2015. Although evidence shows that the parties agreed to the price reduction at the Livonia meeting, Mr. Monteiro testified that it was not incorporated into the Updated Purchase

---

[110] Tr. 5/15/2017 at 77:8 - 78:24 (Monteiro).
[111] Tr. 5/17/2017 at 71:14 - 71:24 (Johnston).
[112] See the 2015 Decision, 2015 WL 4512070 at *3.
[113] Tr. 5/15/2017 at 77:8 - 79:6 (Monteiro).
[114] *Id., see also* P007.
[115] Joint Ex. J139 at 11-13. Tr. 5/17/2017 at 79:9 - 80:23 (Johnston).
[116] Tr. 5/15/2017 at 82:25 - 84:16; 98:12 - 99:16 (Monteiro).

Contracts because the parties were thinking "positively in the sense that we assumed the [60Ah] battery would come."[117]

The Purchase Contracts issued after the Livonia meeting included some of the parties' changes, but no terms related to reducing the 80Ah battery price if the 60Ah battery was not available. Even after the Livonia meeting, the parties continued to revise their agreement. Because that specific revision never made it into a purchase contract, I conclude that DPCC's expert's price delta calculation improperly reduced the base price of the 80Ah batteries to $412 after 2015. Accordingly, DPCC's damages calculation based on this piece of the price delta is overstated, although there is no evidence in the record to show how much this change would decrease DPCC's damage claim.

The next issue is whether to include the increased freight costs (or delivery charges) when measuring Old A123's price against New A123's price. DPCC's expert testified that he included the delivery charge increases in the price delta calculation because freight costs were an element of the Old A123 Contract that increased in the New A123 contract.[118] In contrast, the Trustee's expert did not include freight costs in the damages calculation, because he assumed that in the "but for" world (*i.e.,* what would have occurred "but for" rejection of the contract), DPCC and Old A123 would have renegotiated the old Contract's terms, and DPCC would bear any increased freight costs.[119] Testimony from Mr. Monteiro indicated that Daimler typically paid transportation costs, either by picking up parts or by reimbursing sellers with a freight

---

[117] Tr. 5/15/2017 at 84:11 - 84:13 (Monteiro).
[118] Tr. 5/17/2017 at 76:14 - 78:17 (Johnston).
[119] *Id.*

surcharge.[120]  Accordingly, I conclude that the Trustee's expert is correct and that Daimler would end up paying for shipping even if the freight costs increased.

In summary, both experts' inputs to calculate the price delta between the Old A123 Contract price and New A123 contract price are incorrect.  The Trustee's expert should not have applied the Amendment's price reduction to the 60Ah batteries.  DPCC's expert should not have reduced the price of the 80Ah battery to $412 in 2015, and should not have included increased freight charges in the price delta calculation.  Both experts' price delta calculations must be adjusted accordingly.

### (ii) Determining the quantity of Starter Batteries

The amount of the rejection damages claim varies widely depending on the number of batteries multiplied against the price delta.  There are two options for quantity that may be used in the damage calculations:  (i) the number of batteries that the parties estimated would be required by DPCC under the rejected Contract (*i.e.,* 37,500/year for the series production period of 2013 to mid-2018) (the "Estimated Amount"); or (ii) the number of batteries that DPCC and Daimler actually purchased (and forecast will be purchased) from New A123 for the series production period from 2013 to mid-2018 (*i.e.,* 64,409 for the entire period) (the "Cover Amount").  If the Cover Amount is used, the Trustee raises a sub-issue of whether to limit the Cover Amount to only those Starter Batteries purchased by DPCC from New A123, thereby excluding any batteries purchased directly by Daimler.

---

[120] Q:   In any event, the costs of freight are borne by Daimler, correct?
   A:   Well, ultimately, yes. The question is whether it's directly right away or indirectly[;] either way I pay my own freight forward or I pay the service provided by that supplier.
Tr. 5/16/2017 at 32:18 - 32:24

(a)    The Estimated Amount - Expectation Damages under UCC 2-713

DPCC argues that its damage calculation should be based upon UCC Section 2-713, which provides that damages for a seller's nondelivery or repudiation of a contract are measured by the difference between the market price at the time the buyer learned of the breach and the contract price, together with any incidental and consequential damages provided in UCC Section 2-715, but less expenses saved in consequence of the seller's breach.[121]  This section, DPCC contends, bases damages on the entire amount of batteries that would have been purchased under the Contract, without regard to the number of batteries actually purchased to cover the losses. Because the Old A123 Contract was a requirements contract, damages would be based on the number of batteries the parties estimated DPCC would purchase from Old A123, which was 37,500 Starter Batteries each year of series production.  In this case, the Estimated Amount is much higher than the actual Cover Amount.

Notably, DPCC's proof of claim as filed did not include reference to damages under Section 2-713 of the UCC (entitled "Nondelivery or repudiation; buyer's damages").  The addendum attached to DPCC's Claim for rejection damages provides that those damages include:

- Cover damages, including damages under Section 2-712 of the Uniform Commercial Code, totaling $25,108,942.65.
- Incidental damages, including damages under Section 2-715 of the Uniform Commercial Code, totaling $421,970.

The Claim Addendum also states that "DPCC expressly reserves the right to amend this Proof of Claim to include damages resulting from resourcing production of any A123 product to alternate suppliers, including any damages resulting from project delays and all engineering, rework and tool production expenses."[122]

---

[121] Mich. Comp. Laws 440.2713.
[122] Joint Ex. J122.

Generally, timely filed claims may be amended after the bar date "to describe the claim with greater specificity or even to plead a new theory of recovery on facts established in the original claim."[123] "Only 'amendments' which assert an entirely new claim after the bar date are prohibited."[124]

If a court determines that the amendment may relate back to the timely filed claim, the court should also examine whether it would be equitable to allow the amendment.[125] The analysis may review factors such as (i) whether the debtor, or other creditors, would be unduly prejudiced by the amendment (or whether, instead, other creditors would receive a windfall from the disallowance of the amendment), and (ii) whether the late claimant acted in good faith and the delay was justified.[126] Of these, the critical consideration is whether the opposing party will be unduly prejudiced by the amendment.[127]

The Trustee asserts that DPCC's reliance on UCC Section 2-713 for recovery of damages is untimely since it was not raised until the "eve of trial" (*i.e.*, May 8, 2017) in DPCC's trial brief. The Claim was filed on March 11, 2013, and DPCC asserts that it amended its proof of claim later in March 2013, when DPCC emailed a detailed calculation of its $25 million claim to Old A123 that multiplied the price delta by 37,500 batteries per year for seven years of series production.[128] The email does not mention UCC Section 2-713. Instead, the email refers to its damages

---

[123] *In re Stone & Webster, Inc.,* 547 B.R. 588, 606 (Bankr. D. Del. 2016). *See also In re Speigel, Inc.,* 337 B.R. 816, 820 (Bankr. S.D.N.Y. 2006) (allowing an amendment to a timely filed claim that (i) corrects a defect of form in the original claim; (ii) describes the original claim with greater particularly; or (iii) pleads a new theory of recovery on the facts set forth in the original claim).

[124] *Stone & Webster,* 547 B.R. at 606 citing *Plains Mktg., L.P. v. Bank of America, N.A. (In re SemCrude, L.P.),* 443 B.R. 472, 477-78 (Bankr. D. Del. 2011).

[125] *Speigel,* 337 B.R. at 820 (citing *Midland Cogeneration Venture Ltd. P'ship v. Enron Corp. (In re Enron Corp.),* 419 F.3d 115, 133 (2d Cir. 2005)).

[126] *Speigel,* 337 B.R. at 820.

[127] *Id.*

[128] Ex. P-30.

calculation as the "Gross Cover Cost."[129]  The email reinforces DPCC's claim for cover damages,

yet provides no indication that DPCC was amending its claim to include a theory of damages

based upon UCC Section 2-713.  Further, there is nothing in record to indicate that DPCC sought

to amend the Claim or provide fair and timely notice to the Debtors, or the Liquidating Trustee,

of its assertion of damages under Section 2-713.  In this long fought battle of well-represented

parties, and based on the circumstances before me, I conclude that DPCC should be held to the

original claim of damages as set forth in its proof of claim.[130]  DPCC's request for recovery of

damages under UCC Section 2-713 comes too late into the litigation process and it would be

unfair to the Trustee to allow it at this stage.

(b) The Cover Amount - Cover Damages under UCC 2-712

DPCC's Claim seeks to recover for the actual and forecasted purchases made by DPCC

*and Daimler* for the series production period from 2013 through mid-2018, which its expert

calculated to set at 64,409 in total.[131]  The Trustee does not quarrel with DPCC's claim for cover

damages based upon the number of Starter Batteries actually purchased by DPCC from New

A123.  However, the Trustee argues that Daimler's direct purchases from New A123 should not

be included in DPCC's claim since DPCC has argued that Daimler and DPCC are separate

entities.

---

[129] *Id.*

[130] *See In re ADI Liquidation, Inc.,* 555 B.R. 423, 435-37 (Bankr. D. Del. 2016).

[131] Joint Ex. J139 at 18-20.  Mr. Johnston arrived at this figure by reviewing Daimler's records of the actual number of Starter Batteries supplied by New A123 to DPCC and Daimler from 2013 through March 31, 2016, and New A123 and Daimler's forecasts of the number of Starter Batteries to be supplied through 2018. *Id.* at 8.  The Cover Amount is split between 59,910 80Ah Starter Batteries and 7,499 60h Starter Batteries

DPCC argues in response that Daimler's direct purchases are consequential damages under UCC Section 2-715, which describes consequential damages resulting from a seller's breach as including:

(a)     any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

(b)     injury to person or property proximately resulting from any breach of warranty.[132]

Courts have discussed the difference between incidental and consequential damages as follows:

While the distinction between the two is not an obvious one, the [UCC] makes plain that incidental damages are normally incurred when a buyer (or seller) repudiates the contract or wrongfully rejects the goods, causing the other to incur such expenses as transporting, storing, or reselling the goods. On the other hand, consequential damages do not arise within the scope of the immediate buyer-seller transaction, but rather stem from losses incurred by the nonbreaching party in its dealings, often with third parties, which were a proximate result of the breach, and which were reasonably foreseeable by the breaching party at the time of contracting.[133]

"The seller is liable for consequential damages in all cases where he had reason to know of the buyer's general or particular requirements at the time of contracting."[134] "The test is foreseeability."[135] "The question asked is whether a reasonably prudent person in the position of the breaching party, at the time the parties entered into the contract, would have considered these damages to be the natural consequence of this type of breach."[136]

---

[132] Mich. Comp Laws § 440.2715(2).

[133] *Sullivan Indus., Inc. v. Double Seal Glass Co., Inc.*, 480 N.W.2d 623, 631, 192 Mich.App. 333, 347 (Mich. Ct. App., 1991) (quoting *Petroleo Brasileiro, S.A. v. Ameropan Oil Corp.*, 372 F.Supp. 503 (E.D.N.Y. 1974)).

[134] G. Wallach, *The Law of Sales*, ¶ 10.04[1][b], Cmt. 3 to § 2-715 quoted with approval in *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 653 (3d Cir. 1990).

[135] *Step-Saver*, 912 F.2d at 653.

[136] *Contempo Design, Inc. v. Chi. & N.E. Ill. Dist. Council of Carpenters*, 226 F.3d 535, 554 (7th Cir. 2000) *cert. denied* 531 U.S. 1078 (2001) (citing RESTATEMENT (SECOND) OF CONTRACTS, § 351).

It can come as no surprise to the Debtors that rejecting DPCC's contract would prevent DPCC from supplying Starter Batteries to Daimler for the series production. Old A123 was well aware that it was providing DPCC with Starter Batteries for use by Daimler in Daimler's vehicles. Old A123 responded to the RFQ for Starter Batteries that was issued by Daimler. Old A123 negotiated contract terms with Daimler, and engaged in development efforts with Daimler for Starter Batteries that would be used in Daimler's vehicles. Old A123's Contract with DPCC required delivery of the Starter Batteries directly to Daimler. The Debtors' rejection of the Contract forced Daimler to purchase Starter Batteries for the series production at higher prices, first through DPCC, and later directly from New A123. Daimler's direct purchase of Starter Batteries from New A123 is a foreseeable consequence of the rejection of Old A123's Contract, and, therefore, Daimler's direct purchases may be included in DPCC's claim.

Alternatively, DPCC is entitled to recover damages under the indemnification provision in the Purchase Contracts, which provides:

> (b)    Indemnification. Seller will defend, indemnify, and hold DPCC harmless against all claims, liabilities, losses, damages, and settlement expenses in connection with any breach by Seller of these general conditions or for injury or death of any person and damage or loss of any property allegedly or actually resulting from or arising out of any act, omission or negligent work of Seller or its employees, agents, or subcontractors in connection with performing this order, either on DPCC's property of [*sic*] in the course of their employment.[137]

"An indemnity contract creates a direct, primary liability between the indemnitor and the indemnitee that is original and independent of any other obligation."[138] Under Michigan law, '[i]ndemnity contracts are construed in accordance with the general rules for construction of

---

[137] Joint Ex. J104, ¶11 at B456LT00005686, B456LT00005702.
[138] *Miller-Davis Co. v. Ahrens Constr., Inc.,* 495 Mich. 161, 173, 848 N.W.2d 95, 101-02 (Mich. 2014) (citing 41 Am. Jur. 2d, Indemnity, § 4, p. 417).

contracts."[139] The Court determines "the parties' intent by examining the language of the contract according to its plain and ordinary meaning."[140] The indemnification provision at issue here contains broad language providing that Old A123 will indemnify and hold DPCC harmless from "*all* claims, liabilities, losses [and] damages" "in connection with *any* breach" by Old A123. Using the terms "all" and "any" provides for the broadest possible obligation to indemnify.[141]

The Trustee argues that the DPCC does not have a claim based on the indemnification provision because Daimler has not sought to recover its damages from DPCC, and the Trustee argues that Daimler is unlikely do so.  Considering a similar argument, the Supreme Court of Michigan wrote:

> While the indemnity clauses specifically mention a "claim," they also trigger liability more broadly, when "damages, losses, demands," or "expenses," result from "any act, omission, fault, negligence, or breach...." Furthermore, the definition of "claim" itself is broad. *Black's Law Dictionary* defines a claim as the "aggregate of operative facts giving rise to a right *enforceable* by a court," and "any *right* to payment or to an equitable remedy...."[142]

There is no dispute that Old A123's rejection of the Contract left DPCC unable to fulfill its contractual obligations to deliver Starter Batteries to Daimler at the Contract prices.  That inevitably forced Daimler to purchase Starter Batteries at higher prices demanded by New A123, leaving DPCC liable to Daimler for the premium Daimler paid over the Contract price.  DPCC's liability to Daimler is a direct result of Old A123's breach and is one that Old A123 expressly agreed to assume responsibility for under the indemnity provision.

Accordingly, DPCC's claim against Old A123 may include the consequential damages based on the higher price paid by Daimler for Starter Batteries purchased directly from New A123

---

[139] *Grand Trunk W. R.R., Inc. v. Auto Warehousing Co.*, 262 Mich. App. 345, 686 N.W.2d 756, 761 (Mich. Ct. App. 2004).

[140] *Miller-Davis*, 848 N.W.2d at 102.

[141] *Id.* at 102-03.

[142] *Miller-Davis*, 848 N.W.2d at 103 (quoting *Black's Law Dictionary* (9th ed.), pp. 281-82).

to cover the batteries DPCC was required to deliver to Daimler under the Contract, but could not due to Old A123's breach. The price delta should be multiplied against the entire Cover Amount as determined by DPCC's expert: 64,409 batteries.

(iii)   Spare Parts

DPCC's claim includes damages based on the extra cost to obtain spare parts from New A123 after the end of the series production (or "EOP"). The 3 Year Policy ("3YP") provision of the Purchase Contracts provides:

> After the end of delivery for series production, the price for the spare parts shall be calculated from the most recently applicable series production price plus the costs actually incurred by the Supplier for special packaging. This price is fixed for a period of three years from the end of series production. The parties agree to renegotiate the new prices for the provision of spare parts no later than three months prior to the end of the three-year period. Until a new price has been agreed, the most recently agreed price shall apply. The parties must not unduly hinder negotiations on agreement of a new price.[143]

The Purchase Contracts also provide that they are subject to the Mercedes-Benz Special Terms ("MBST"), which provide in pertinent part that:

> The supplier undertakes to supply DAIMLER spare parts **for the product for a period of at least 15 years after discontinuation of production.** Delivery is made at the request of Daimler.[144]

The Trustee's expert did not include any damages for spare parts in DPCC's claim because he assumed that, following expiration of the 3YP period, Old A123 and Daimler would have re-negotiated and agreed on a market price for the spare parts - - and the market price would be the same price that will be charged by New A123.[145] However, the Contract (specifically the 3YP

---

[143] Joint Ex. J104 at B456LT00005678, B456LT00005694.

[144] Joint Ex. J151 at DPCC2008010 (emphasis in original); Tr. 5/15/2017 at 88:2- 89:7 (Monteiro).

[145] Tr. 5/19/2017 at 45:12 - 49:5 (Vanderveen). Mr. Vanderveen testified, "I've worked for a fair number of automotive suppliers. And in my experience, the relationship is very delicate between an OEM and an automotive supply company. It's mutually dependent on each other. I don't think I have to explain that the supplier needs the business and the OEM needs the supplier's business desperately. . . . [I]n the economic system in which these contracts exist, the parties could agree to a particular price, and that would

provision) sets the price for spare parts at the last series production base price for the first three years after EOP. Further, the spare parts pricing *after* the 3YP period (*i.e.,* beginning in 2022), is based on a multiple of the base price.[146] Because the spare parts pricing is based on the last series production base price, rejection of the Contract requires Daimler to pay more for spare parts than it would have paid to Old A123, because New A123's base price for the Starter Batteries is higher. DPCC's claim should include damages based on the increased cost Daimler will incur for spare parts as a result of rejection of the Contract.

The spare parts damage calculation by DPCC's expert relies on three primary components: the spare parts price delta, volume, and duration (or the number of years for supplying the spare parts).[147] The Contract sets the duration at 15 years after EOP. The Trustee disagrees with DPCC's expert's conclusions regarding pricing and volume.

    (a)    <u>Spare Parts Pricing</u>

To establish spare parts pricing, DPCC's expert relied on information from Mr. Monteiro, who was responsible for procuring a variety of Daimler's spare parts between 2005 and 2010.[148] Mr. Monteiro advised that "spare parts pricing at Daimler, and in the automotive supply industry generally, is based on a percentage increase model, wherein the spare parts price is periodically (every 3-5 years) increased over time by a percentage of the last series production price."[149] At trial, Mr. Monteiro explained that prices for spare parts increase over time because, as the technology develops, often the part is no longer being manufactured in a series and, especially

---

be a market price." *Id.* at 48:5 - 48:18. Mr. Vanderveen also did not include spare parts costs as part of DPCC's damages because DPCC stopped purchasing batteries in early 2015 and, therefore, would not purchase spare parts after series production. However, as explained earlier in this Opinion, Daimler's direct purchases are included as part of DPCC's damage claim.

[146] *See, e.g.,* Tr. 5/15/2017 at 117:11 - 1182 (Monteiro).
[147] Tr. 5/17/2017 at 44:2245:17 (Johnston).
[148] Joint Ex. J139 at 16-17.
[149] Joint Ex. J139 at 17.

with complex components, it can be very costly to changeover production facilities to produce a smaller number of those components as spare parts.[150] Based on Mr. Monteiro's experience and familiarity with procurement at Daimler, and with the Starter Batteries at issue, DPCC's expert relied on Mr. Monteiro's estimate that the price for spare parts would increase as follows:

| Number of years following series production | Price[151] |
| --- | --- |
| Years 1 - 3 | Last production price (3YP) |
| Years 4 - 7 | 100% increase over last production price |
| Years 8 - 11 | 200% increase over last production price |
| Years 12 - 15 | 300% increase over last production price |

DPCC's expert also spoke to Sam Trinch, Executive Vice President of New A123, who advised that, consistent with his experience in the industry, spare price pricing is based on a multiple of the last production price.[152] Mr. Trinch expected an initial increase of 1.5 to 2.0 times the last series production price after 3YP.[153] Based on these discussions, DPCC's expert accepted Mr. Monteiro's assumptions about anticipated spare parts price increases.[154]

To rebut DPCC's spare parts pricing analysis, the Trustee provided testimony of Dr. Bart Riley, who holds a Ph.D. and an M.S. in Materials Science from Cornell University, was one of the principal inventors of A123's battery technology (along with being named inventor on more than 60 other patents), and has deep technical knowledge and considerable experience with Old A123's actual manufacturing process.[155] Based on his experience and expertise in overall cost

---

[150] Tr. 5/15/2017 at 115:8 - 123:15 (Monteiro); Tr. 5/16/2017 at 54:4 - 57:12 (Monteiro).
[151] Joint Ex. J139 at 17.
[152] Joint Ex. J139 at 17.
[153] Id.
[154] Id. at 17-18.  Tr. 5/17/2017 at 46:19 - 51:25 (Johnston).
[155] Joint Ex. J142, Ex. A; Tr. 5/17/2017 at 163:11 - 169:15 (Riley).

structures of series and spare parts production and manufacturing at Old A123, Dr. Riley testified

that a reasonable and conservatively high estimate of spare parts pricing assumes an increase of,

at most, 50% over series production prices.[156] Dr. Riley based his estimate on "three basic factors

that would affect cost structure in a sporadic demand or lower demand environment" than series

production: (1) raw materials, (2) managing factory utilization (*i.e.,* switchovers and downtime);

and (3) managing finished goods inventory to optimize the cost structure.[157]

Dr. Riley estimated that a 15% increase in price would account for any increase in the cost

of raw materials.[158] He testified that many of the materials needed for the batteries are "readily

abundant and not subject to commodity fluctuations" resulting in "very high confidence and very

stable, cheap pricing for our raw materials."[159] He also described a strategy of inventorying raw

materials as a way to manage costs and provide stability of the supply chain.[160]

Next, Dr. Riley estimated a 25% increase in price to cover the "cost for lost production

time, which takes into account line changeover and lost efficiency of production."[161] Dr. Riley

testified that line changeovers are "a very managed process" and could be achieved in "less than

a single shift operation."[162] Based on his experience overseeing manufacture of lithium-ion

batteries at Old A123 for Daimler's Formula 1 program, Dr. Riley testified that Old A123

"optimized a system to minimize the number of changeovers, to have sufficient inventories of the

right parts when we needed them, and we would use inventorying of finished goods as part of our

strategy to minimize cost."[163] He noted lithium-ion cells can be stored at room temperature for

---

[156] Joint Ex. J142; Tr. 5/17/2017 at 173:14 - 174:1; 175:1 - 176:4 (Riley).
[157] Tr. 5/17/2017 at 192:16 - 193:22 (Riley).
[158] Joint Ex. 142 at 5; Tr. 5/17/2017 at 195:7 - 195:14 (Riley).
[159] Tr. 5/17/2017 at 193:23 - 195:6 (Riley).
[160] Tr. 5/17/2017 at 186:21 - 188:1 (Riley).
[161] Joint Ex. 142 at 5.
[162] Tr. 5/17/2017 at 190:7 - 190:22 (Riley).
[163] Tr. 5/17/2017 at 184:6 - 184:23 (Riley).

long periods of time, and that warehousing space is inexpensive in China or Michigan; therefore, A123 could produce more spare parts and inventory them to get a cost-effective use of a changeover.[164]

In addition to the price increase of 15% for raw material costs and 25% for lost production time, Dr. Riley also estimated a 10% incremental margin to incentivize the manufacturer.[165] Together, these costs account for the 50% increase to the series production base price that Dr. Riley estimated for spare parts. He also disagreed with Mr. Monteiro's inclusion of a periodic price increase (every 3 - 5 years) for spare parts over the 15 year obligation, stating that, although the risk that a supplier will discontinue a product increases over time, the cost of mitigating that risk by proper management of the supply chain does not change.[166]

DPCC has the burden of proving that the figure it relies on for spare parts damages is reasonable. There is no doubt that Mr. Monteiro has experience in procuring spare parts for Daimler and familiarity with the manufacturing process for Starter Batteries. However, he did not provide much detail for his estimate of the 100-200-300 percent increase, except by referring to his experience. On the other hand, Dr. Riley's presented a detailed and specific analysis of the elements underlying his price increase, which provided a sound basis to successfully rebut Mr. Monteiro's estimate. Accordingly, I conclude that Dr. Riley's estimate of a 50% price increase was better supported and should form the basis for calculating the price delta for the piece of DPCC's claim related to spare parts damages.

---

[164] Tr. 5/17/2017 at 185:10 - 186:20 (Riley).
[165] Joint Ex. 142 at 5; Tr.
[166] Tr. 5/17/2017 at 198:22 - 199:18.

     (b)    Spare Parts Volume

DPCC's expert considered two primary factors in estimating the number of spare parts batteries that will be required: "(1) the estimated useful life of the battery; and (2) the number of vehicles that were manufactured with an original battery that are expected to be in service at the time the original battery reaches the end of its estimated useful life."[167]  New A123 represented to Daimler that the useful life of the battery is 10 years.[168]  To calculate the number of vehicles expected to be on the road ten years after receiving an original battery, DPCC's expert consulted Daimler's spare parts forecasting group, called Global Service Parts or "GSP."[169]  It is GSP's task "to forecast the need for spare parts and everything else related to the spare parts business of Daimler."[170]  GSP provided DPCC's expert with a rate of decline of approximately 11% per year.[171]  DPCC's expert then wrote:

> Using this rate of annual decline and the actual and projected number of batteries to be supplied during the series production contract term of 2013 through 2018, I calculated the number of vehicles containing original batteries supplied by New A123 that would be expected to remain in service 10 years after such vehicle was produced.  I have assumed that this number of vehicles is a reasonable estimate of the number of spare parts batteries that will be required to be supplied by New A123 through 2033 (the 15 year period following the end of series production in 2018).[172]

Based on this methodology, DPCC's expert estimated the number of spare parts that will be required by Daimler during the 15-year spare parts period to be 20,056.[173]  The Trustee offered no evidence to rebut this calculation.

---

[167] Joint Ex. J139 at 20; Tr. 5/17/2017 at 54:14 - 54:25 (Johnston).
[168] Joint Ex. J139 at 20; Tr. 5/17/2017 at 56:17 - 57:3 (Johnston).
[169] Joint Ex. J139 at 20-21; Tr. 5/17/2017 at 57:4 - 57:13 (Johnston).
[170] Tr. 5/17/2017 at 57:8 - 57:13 (Johnston).
[171] Joint Ex. J139 at 21; Tr. 5/17/2017 at 57:24 - 58:19 (Johnston).
[172] Joint Ex. J139 at 21.
[173] *Id.*

      (c)     <u>Spare parts conclusion</u>

Accordingly, DPCC's spare parts damages should be determined by multiplying the volume of 20,056 parts against a spare parts price delta based the base prices for the 3YP period and a 50% price increase for remaining spare parts period.

    (iv)  <u>Determining the present value of the Claim</u>

      (a)     <u>The Discount Date</u>

Recognizing the time-value of money, courts have reduced claims for future damages to present value as of the petition date.[174] "Discounting is consistent with the fundamental goal of treating similar claims in the same manner . . . and reflects the economic reality that a sum of money received today is worth more than the same amount received tomorrow . . . ."[175] The Trustee argues that DPCC's claim is an unsecured, prepetition claim for future contract damages that should be reduced to present value as of the petition date.

There is support in the Bankruptcy Code for using the petition date in such an exercise. Rejection of an executory contract under Bankruptcy Code § 365 constitutes a breach of that contract immediately before the date the bankruptcy petition was filed.[176] A rejection claim shall be determined, and shall be allowed, as if the claim arose before the date the bankruptcy petition was filed.[177] Section 502(b) of the Bankruptcy Code provides that, if an objection is made, "the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of

---

[174] *USGen New England, Inc. v. TransCanada Pipelines, Ltd. (In re USGen New England, Inc.),* 429 B.R. 437, 490 (Bankr. D. Md. 2010) quoting *Pension Benefit Guar. Corp. v. Belfance (In re CSC Indus., Inc.),* 232 F.3d 505, 508 (6th Cir. 2000) ("[T]he bankruptcy court must value present claims and reduce claims for future payment to present value while also keeping in mind that a fundamental objective of the Bankruptcy Code is to treat similarly situated creditors equally.").

[175] *In re Oakwood Homes Corp.,* 449 F.3d 588, 604 (3d Cir. 2006) (Smith, J. dissenting) (quoting *In re Trace Int'l Holdings,, Inc.,* 284 B.R. 32, 38 (Bankr. S.D.N.Y. 2002)).

[176] 11 U.S.C. § 365(g)(1).

[177] 11 U.S.C. § 502(g)(1).

the United States as of the date of the filing of the petition, and shall allow such claim in such amount," subject to certain exceptions not applicable here.[178]

DPCC, on the other hand, claims that discounting its damages claim to the petition date is contrary to Michigan law and the decision by the Court of Appeals for the Third Circuit in *In re Oakwood Homes Corp.*[179] DPCC asserts that Michigan law, which applies here, defines "future damages" as only those damages arising after the date judgment is entered.[180] Therefore, DPCC asserts that the appropriate discount date is the date this Court issues a decision on its claim amount. In his report, DPCC's expert used an approximate hearing date (May 1, 2017) for the discount date.[181]

DPCC also argues that it is entitled to recover pre-judgment interest on its claim under Michigan law, and, therefore, discounting its claim to present value as of the petition date results in the type of "double discounting" that the Third Circuit rejected in *Oakwood Homes.*[182]

In *Oakwood Homes,* the Third Circuit determined that Section 502(b) does not require *all* claims to be discounted to present value as of the petition date, writing:

> Stated simply, 11 U.S.C. §502(b) speaks in terms of determining the "amount" of a claim "as of" the petition date. However, given that the remainder of the Bankruptcy Code uses the term "value, as of," to signify discounting to present value, and "amount" and "value" are not synonymous, we cannot say that § 502(b) clearly and unambiguously requires discounting to present value in all situations.[183]
> . . . .

---

[178] 11 U.S.C. § 502(b).

[179] 449 F.3d 588 (3d Cir. 2006).

[180] DPCC's Proposed Findings of Fact and Conclusions of Law (D.I. 2450) at ¶ 136 citing Mich. Comp. Laws 600.6013; 600.6301.

[181] Tr. 5/17/2017 at 101:6 - 101:13 (Johnston).

[182] *Id.* at ¶ 137-38.

[183] *Oakwood Homes,* 449 F.3d at 595. The Court noted that when "the Bankruptcy Code intends a court to discount something to present value, the Code clearly uses the term 'value, as of' a certain date. *See, e.g.,* 11 U.S.C. § 1129 ('value, as of the effective date of the plan'), 1173 (same), 1225 (same), 1325 (same), 1328 (same)." *Id.* at 597.

We do not hold here that 11 U.S.C. § 502(b) *never* authorizes discounting a claim to present value, but instead that the statute does not clearly and unambiguously *require* it for all claims evaluated under §502.   In general, we of course acknowledge that money negotiated to be received in the future, and reduction in recognition of that basic economic fact may sometimes be appropriate.   The subsections of § 502(b) encompass various financial circumstances, . . . ; therefore, we must look at the interplay between the subsection at issue here, § 502(b)(2), and § 502(b) as a whole.[184]

The *Oakwood Homes* Court reviewed two rulings by the bankruptcy court on an objection to a claim based on interest-bearing debt.  The first bankruptcy court ruling disallowed any portion of the claim attributable to post-petition "unmatured" interest under § 502(b)(2).[185]  The second bankruptcy court ruling determined that the principal amount of the claim should be discounted to present value pursuant to § 502(b).[186]  The Third Circuit held that the bankruptcy court erred, deciding:

> [T]he interplay between § 502(b) and § 502(b)(2), as reflected in both the legislative history and basic economics, acknowledges that once unmatured interest has been disallowed, discounting the remainder of the claim to present value would inequitably twice penalize the creditor for the time value of money. We wholeheartedly agree that future liabilities must be reduced in some way to reflect the time value of money, but doing so twice is . . . "double discounting" . . . .[187]

DPCC's reliance on *Oakwood Homes* is misplaced.  *Oakwood Homes* is limited to claims based on interest-bearing debt, and DPCC's underlying claim is not based upon an interest-bearing instrument and did not include any bargained-for right to interest.[188]  The Third Circuit recognized that stripping the post-petition interest from an interest-bearing debt left a claim for principal - - or the present value of the debt.  Discounting the principal amount to present value

---

[184] *Oakwood Homes*, 449 F.3d at 598 (emphasis in original) (footnote omitted).
[185] *Oakwood Homes*, 449 F.3d at 591; 11 U.S.C. §502(b)(2) (disallowing claims to the extent such claim is for unmatured interest).
[186] *Id.*
[187] *Id.* at 601.
[188] *Id.* at 603.

results in a double-discounting. Here, the rejection damages claim seeks recovery of future

damages, which is not akin to a claim for principal. Instead, future damage claims are typically

discounted to present value.[189]

DPCC's assertion of a right to pre-judgment interest (arising here post-petition), based on

Michigan law, is also flawed. "The 'basic federal rule' in bankruptcy is that state law governs the

substance of claims, . . . Congress having 'generally left the determination of property rights in

the assets of a bankruptcy's estate to state law.'"[190] "Creditors' entitlements in bankruptcy arise

from the underlying substantive law creating the debtor's obligation, *subject to any qualifying or

contrary provisions of the Bankruptcy Code*."[191] In other words, the amount and validity of claims

are determined by state law to the extent that law does not conflict with the Bankruptcy Code.

Although DPCC's contractual damages are determined by Michigan law, issues such as

the timing of payment or adding post-petition interest to its claim, are subject to provisions in the

Bankruptcy Code. "The general rule is that payment of any post-petition interest . . . on pre-

petition unsecured claims is prohibited by the Bankruptcy Code."[192] Because DPCC is not

---

[189] *See, e.g., In re O.P.M Leasing Servs., Inc.*, 79 B.R. 161, 167 (S.D.N.Y. 1987) ("Equality of treatment at distribution is a fundamental principle underlying the bankruptcy laws. By discounting a claim arising from the postpetition rejection of an executory contract or unexpired lease, the postpetition claimant is treated the same as the pre-petition claimant, an explicitly stated purpose of 11 U.S.C. § 365.") (citation omitted); *Matter of Penn Central Transp. Co.,* 596 F.2d 1102, 1116 (3d Cir. 1979) ("Plainly, the promise of a dollar payable in several years is not worth 100 cents today.").

[190] *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 20, 120 S. Ct. 1951, 1955, 147 L. Ed.2d 13 (2000) quoting *Butner v. United States,* 440 U.S. 48, 57, 99 S. Ct. 914, 59 L. Ed.2d 136 (1979).

[191] *Raleigh,* 530 U.S. at 20 (emphasis added) citing *Butner,* 440 U.S. at 55; *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 161-62, 67 S. Ct. 237, 91 L. Ed. 162 (1946). *See also Unsecured Creditors Comm. of Highland Superstores, Inc. v. Strobeck Real Estate, Inc. (In re Highland Superstores, Inc.),* 154 F.3d 573, (6th Cir. 1998) ("[Courts] have uniformly held that a lessor's damages are computed in accordance with the terms of the debtor's lease and applicable state law, and then are limited by application of section 502(b)(6).") (citations omitted).

[192] *In re W.R. Grace & Co.,* 475 B.R. 34, 159 (D. Del. 2012); *Hacienda Heating & Cooling, Inc. v. United Artists Theatre Circuit, Inc. (In re United Artists Theatre Co.),* 406 B.R. 643, 651 (Bankr. D. Del. 2009). *See also In re Energy Future Holdings Corp.,* 540 B.R. 109 (Bankr. D. Del. 2015).

entitled to pre-judgment interest, discounting the amount of DPCC's claim to the petition date

does not result in the "double discounting" that was criticized in *Oakland Homes.*

Finally, DPCC also contends that equitable considerations weigh against discounting its

rejection damages claim to the petition date.  DPCC contends that it is disadvantaged because the

litigation over its claim has dragged on and prevented it from receiving a distribution at the same

time as other unsecured creditors.  A similar argument was rejected in *USGen New England.*[193]

There, the creditor argued that its claim was no longer for "future damages" because the litigation

stretched out beyond the term of the contract and, at the time of the judgment, no future payments

were due.[194]  The Court decided:

> [Section] 502(b) provides that a bankruptcy court "determine the amount [of a claim] . . . as of the date of the filing of the petition."  At the time USGen filed its bankruptcy petition on July 8, 2003, future payments remained due under the Contract.  Thus discounting to the Petition Date is required.  The fact that the litigation over the amount of the claim spanned beyond the term of the Contract is irrelevant.  Adopting [the creditor's] position would require the Court to treat unsecured claims of creditors differently depending on the date that their claim was finally adjudicated.  This outcome violates a fundamental objective of bankruptcy, namely, to treat similarly situated creditors equally.[195]

I agree that the length of the litigation is irrelevant to determining the claim amount.  At the time

Old A123 filed its bankruptcy case in 2012, the DPCC contract imposed future obligations upon

both parties through 2018.  Pursuant to § 502(b), DPCC's claim should be determined as of the

petition date.

---

[193] *USGen New England, Inc. v. TransCanada Pipelines, Ltd. (In re USGen New England, Inc.),* 429 B.R. 437, 491 (Bankr. D. Md. 2010).

[194] *Id.*

[195] *Id.* (citing *CSC Indus.,* 232 F.3d at 508).

(b)     The Discount Rate

The parties also disagree about the appropriate discount rate that should be used to discount the claim to present value as of the petition date. The discount rate is applied to the total future damages claim for the purpose of reducing the claim to an amount consistent with the allowed amounts of other prepetition unsecured claims.[196] "[T]he discount rate performs two functions: (i) it accounts for the time value of money; and (ii) it adjusts the value of the cash flow stream to account for risk."[197]

DPCC argues that Michigan law requires using a risk free discount rate to place the non-breaching party in the position it would have enjoyed if the breaching party had fully performed. In other words, DPCC argues that compensating a creditor for future damages requires setting a sum which, if securely invested at a simple interest rate, would amount to the desired damage award at the end of applicable time period.[198] At trial, DPCC's expert testified that the risk free rate as of the petition date (October 16, 2012) was 2.51%.[199]

The Trustee, however, argues that the appropriate discount rate should account for the risk of Old A123's non-performance of the Contract. The Trustee's expert, relying on publicly available information about Old A123's debt in Form 10-Ks, calculated the weighted average cost of debt ("WACD") for Old A123 in 2012 at 13.71% for use as the applicable discount rate.[200]

---

[196] *In re Mirant Corp.*, 332 B.R. 139, 158 (Bankr. N.D. Tex. 2005).
[197] *Energy Capital Corp. v. United States,* 302 F.3d 1314, 1333 (Fed. Cir. 2002).
[198] DPCC Proposed Findings of Fact and Conclusions of Law, D.I. 2450, at ¶127 citing *Rivers v. Bay City Traction & Elec. Co.,* 128 N.W. 254, 259 (Mich. 1910).
[199] *See* Demo. P19, Joint Ex. J139 at 22 n. 45.
[200] Tr. 5/19/2017 at 54:18 - 55:20 (Vanderveen); *see also* Demo D22.

In *Chemtura Corporation,* the bankruptcy court considered a similar issue of whether to apply a risk-free discount rate, or a discount rate that accounts for the risk that the debtors might not perform under the contract.[201]   The *Chemtura* Court explained that:

> The basic principle of recovery for breach of contract is that the injured party should be placed in the same position it would have been in had the contract been performed. But there is a tension, many might agree, between trying to match the original bargain in the damages award, on the one hand, and requiring the prevailing party to endure market risk to get the benefits of its damages award, on the other. Ultimately, however, I believe that existing case law and common sense require that the discounting to fix the damages award must reflect the same payment risk . . . as the original contract did.[202]

From an economic standpoint, the appropriate discount rate should reflect the investment risk of an alternative investment with similar characteristics.[203]   The *Chemtura* Court decided that the discount rate should reflect the risk of nonperformance at the time the parties entered into the underlying contract.[204]   The *Chemtura* Court rejected both parties' proposed discount rates.   The creditor's risk free rate did not account for any risk premium.   The debtor's discount rate based on Chemtura's weighted average cost of capital ("WACC") included too high a risk premium that reflected "the company as it had evolved, and incorporated all of the risks that might affect the value of the company" while only a subset of those risks would apply at the time the original contract was entered into between the creditor and a predecessor to the debtor.[205]

---

[201] *In re Chemtura Corp.,* 448 B.R. 635, 672 (Bankr. S.D.N.Y. 2011).

[202] *Id.* at 673.

[203] *Id.* at 673 (citing *Teachers Ins. and Annuity Assoc. of Am. v. Ormesa Geothermal,* 791 F.Supp. 401, 416-17 (S.D.N.Y. 1991)).

[204] *Chemtura,* 448 at 676.  The *Chemtura* Court distinguished cases that used a risk free discount rate, specifically *In re Highland Superstores, Inc.,* 154 F.3d 573 (6th Cir. 1998) and *Kucin v. Devan,* 251 B.R. 269 (D. Md. 2000).  The *Mirant* Court also noted that the analyses of the courts in *Highland* and *Kucin* were flawed since they "presented a dichotomy between a risk-free discount rate and a discount rate that takes into account the debtor's creditworthiness *at the time of the breach.*  Neither Court considered the appropriateness of including in the discount rate a risk factor based upon an *ex ante* view of the debtor's creditworthiness at the time the parties entered into the contract." *Mirant,* 332 B.R. at 157 n.49.  I agree that those cases are distinguishable and conclude that the reasoning underlying both *Chemtura* and *Mirant, supra,* is applicable to the rejection damages claim here.

[205] *Chemtura,* 448 B.R. at 676-77.

In *Mirant Corporation*, the court also decided that an appropriate discount rate would reflect the risk of the debtor's non-performance prior to the bankruptcy filing.[206] The *Mirant* Court applied a discount rate that was based upon the interest rates the debtors paid for borrowed money prepetition, when the debtors were more creditworthy. [207] The *Mirant* Court decided that the prepetition interest rates represented a fair measure of the market's assessment of the risk associated in dealing with the debtors.[208]

I agree with the analyses of the courts in *Chemtura* and *Mirant* that the appropriate discount rate should reflect the risk associated with Old A123 at the time the parties entered into the Contract. Accordingly, DPCC's risk free discount rate cannot be used here. The Trustee's expert calculated the WACD for Old A123 as of the 4th quarter of 2012, which was after the Debtors filed bankruptcy.[209] There is no clear contract date in this matter. As discussed in my 2015 Decision on cross-motions for summary judgment, DPCC issued Purchase Contracts to Old A123 starting in May 5, 2011.[210] The parties continued to discuss terms and DPCC issued revised Purchase Contracts on November 15, 2011 and November 29, 2012.[211] The Debtors filed their bankruptcy petitions on October 16, 2012. Finally, in December 2012, Old A123 and DPCC reach a "critical juncture in their relationship" and executed the Amendment to the Purchase Contracts to memorialize Daimler's agreement to pay some of Old A123's NRE Costs up front to complete testing of the Starter Batteries.[212] In the Amendment, the parties confirmed the full

---

[206] *Mirant*, 332 B.R. at 158.
[207] *Id.* at 159.
[208] *Id.*
[209] *See* Demo D22.
[210] *B456*, 2015 WL 4512070 at *2 - *3.
[211] *Id.*
[212] *Id.* at *6.

force and effect of the prior Purchase Contracts.[213] The Trustee argues that the contract date is December 10, 2012, when the parties signed the Amendment, which was post-petition.

However, even if I consider the Contract date as early as May 2011, evidence shows that DPCC and Daimler knew that contracting with Old A123 involved a serious level of risk. The internal Daimler report evaluating Old A123's response to Daimler's RFP against a competitor's response assessed the companies on numerous points, including "Risk Status."[214] The report permitted assignment of risk at the following levels (in the following order): "Go, Concern, Watch, Recovery, Restructuring, Bankrupt, tbd."[215] Old A123 was assigned the risk of "Restructuring," while the competitor's proposal was assigned "tbd."[216]

DPCC and Daimler clearly knew that contracting with Old A123 had a significant level of risk. Despite this risk level, the WACD calculation by the Trustee's expert is based upon a post-petition date. An analysis of Old A123's WACD may not change significantly between the first Purchase Order issued in May 2011 and the final amendment signed in December 2012. However, setting the discount rate solely on the post-petition date may skew toward too high of a risk. It is more appropriate to analyze the Debtors' WACD as of the date of the first written Purchase Contract - - or May 2011. Because Old A123 may have already been on a financial precipice, additional analysis may not yield a lower discount rate, but I believe it is more appropriate to reject both proposed discount rates and await further analysis of the discount rate at a more appropriate date.

---

[213] *Id.* at *7.
[214] Exhibit P2, p. 6.
[215] *Id.*
[216] *Id.*

(v)    Attorney Fees

DPCC also argues that the Contract's indemnification provisions provide that its claim should include recovery of attorney's fees arising from Old A123's breach. Since rejection of the Contract occurred postpetition, the attorney's fees at issue were incurred postpetition. Courts have been divided over the issue of whether an unsecured creditor can recover postpetition attorney's fees and costs as part of its allowed claim against the bankruptcy estate.[217] I considered a similar issue in *Tribune Co.,* and agreed with the analysis of the court in *Global Industrial Technologies* that the plain language of Bankruptcy Code § 502(b) and § 506(b), when read together, indicate that postpetition interest, attorney's fees and costs are recoverable only by oversecured creditors.[218] DPCC is not entitled to recover post-petition attorney's fees as part of its unsecured rejection damages claim.

CONCLUSION

For the reasons stated above, I conclude that both experts incorrectly calculated DPCC's rejection damages claim. Calculation of the price delta between the Old A123 Contract and the New A123 contract for the Starter Batteries during series production must be adjusted because the parties mistakenly (i) changed the price of 60Ah Starter Batteries based on the Amendment, (ii) reduced the price of the 80Ah Starter Battery when 60Ah Starter Battery was not available; and (iii) included freight costs in the Claim calculation. DPCC's spare parts damages also must be revised based on a 50% price increase, rather than DPCC's 100-200-300% price increase calculation. Finally, an appropriate discount rate must be determined based upon the Debtors' weighted average cost of debt as of the date of the First Purchase Contract.

---

[217] *In re Tribune Co.,* 2015 WL 7307305, *3 (Bankr. D. Del. Nov. 19, 2015).
[218] *Id.*

The parties should confer to determine if they can agree upon a revised rejection damages claim amount consistent with my conclusions.   I will schedule a status conference to discuss the revised Claim amount.   An appropriate Order follows.

BY THE COURT:

KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT

Dated:  December 22, 2017